**Robert & Linda PROVOST, Plaintiffs–Appellants–Cross–Appellees,**

**v.**

**The CITY OF NEWBURGH, Ulysses Otero and Patrick Sorrentino, Defendants–Appellees,**

**John Roper, Defendant–Appellee–Cross–Appellant.**

**Docket Nos. 00–7790, 00–7791.**

United States Court of Appeals, Second Circuit.

Argued Jan. 19, 2001.

Decided Aug. 17, 2001.

Robert N. Isseks, Middletown, NY (Steven M. Melley, of counsel), for Plaintiffs–Appellants–Cross–Appellees.

Monte J. Rosenstein, Middletown, NY, for Defendants–Appellees and Defendant–Appellee–Cross–Appellant.

Before: NEWMAN, LEVAL, and SACK, Circuit Judges.

SACK, Circuit Judge:

Plaintiff Robert Provost[1] appeals from a May 19, 2000 judgment of the United States District Court for the Southern District of New York (George A. Yanthis, *Magistrate Judge*) granting partial judgment as a matter of law to the defendants following a trial and a jury verdict for the

---

1. Although the caption lists both Robert Provost and his wife Linda as appellants, Linda Provost is not a party to this appeal. All uses of the name "Provost" in this opinion refer to Robert Provost.

plaintiff. One of the defendants in that trial, John Roper, cross-appeals the portion of the same judgment that awarded the plaintiff nominal and punitive damages against him in accordance with the verdict.

The underlying claims stemmed from an argument that occurred on February 24, 1995 at the Newburgh, New York police station between Provost and a receptionist, after which Provost was arrested and incarcerated for about two and a half hours. Provost filed suit under 42 U.S.C. § 1983 alleging that police officer John Roper and two other officers, including Roper's supervisor, Lieutenant Patrick Sorrentino, had deprived him of his rights under the First and Fourth Amendment applied to the defendants through the Fourteenth Amendment.[2] During the course of the three-day trial, after both sides rested, the defendants made a motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a). The district court reserved decision and submitted the case to the jury. The jury returned a verdict awarding nominal and punitive damages to Provost against Roper and Sorrentino. The defendants then moved for judgment as a matter of law under Rule 50(b), or, in the alternative, for a new trial under Rule 59. The court granted the motion for judgment as a matter of law with respect to Sorrentino but denied the motions in all other respects. Provost appeals from the judgment, and Roper cross-appeals. We affirm in all respects.

## BACKGROUND

Robert Provost was at all times relevant to this appeal the owner and operator of a half-way house for handicapped and mentally ill adults, most of them veterans. When he awoke on the morning of February 24, 1995, he learned that one such veteran-resident, Bob Stratton, had turned up at the Newburgh police station after an unexplained three-day absence.

Provost drove to Newburgh to retrieve Stratton and arrived at the police station at around nine in the morning. He then walked up to a bullet-proof reception window and asked to see Stratton. Dave Fisher, a parking officer seated behind the window, told Provost that he would be attended to "in a little while."[3] Provost grew impatient; at intervals of about ten or fifteen minutes for the next hour, he returned to the window and asked that Fisher produce Stratton. On what would prove to be his last visit to the reception window, Provost grew angry and told Fisher, in Provost's words, "Look. I gotta get out of here. Get on that phone. Call somebody in the back. Get somebody out here to help me." To the officers on Fisher's side of the glass, Provost's comments sounded less polite, conveying "something to the effect of 'what do you mean you don't know where he is?'," "'I don't have time for this bullshit,'" and "'I can't sit around on my fat ass all day like you.'" Each of these officers testified that Provost was "shouting very loudly," "raising his voice," or "yelling and screaming" at Fisher. Provost conceded at trial that during the dispute he "yelled through the window," "hollered at" Fisher, and generally became "noisy." Without responding to Provost's final entreaty, Fisher picked up the phone next to him and made a brief call.

In the same room as Fisher, and behind the glass separating Fisher and Provost, were two police officers, John Roper and

---

**2.** Plaintiff Linda Provost also brought a common-law negligence claim against Sorrentino, the dismissal of which was not appealed.

**3.** As it turned out, Stratton had apparently left the station a few minutes before Provost arrived.

his supervisor Lieutenant Patrick Sorrentino. They heard Provost raising his voice to Fisher—though Roper and a fellow officer testified that one was required to do so in order to be heard through the thick glass—and Sorrentino told Roper to "go and handle the problem." Roper invited Provost into the hallway adjoining the glassed-in room and inquired as to the difficulty. Provost responded that he was frustrated by Fisher's inattention and anxious to retrieve Stratton. Roper testified that once he realized Provost was "not going to be calmed down," he decided to place Provost under arrest. During the arrest, Sorrentino and a third officer, Ulysses Otero, were apparently standing behind Provost. They witnessed the arrest, though Sorrentino testified at trial that he did not remember whether he saw Roper placing handcuffs on Provost.

Provost was escorted—roughly, he claims—down the hall and was then handcuffed to a bench, where the officers "scream[ed], sw[ore], [and] holler[ed]" at him. He was charged with disorderly conduct in violation of § 240.20(3) of the New York Penal Code. A person is guilty of this form of disorderly conduct "when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [i]n a public place, he uses abusive or obscene language, or makes an obscene gesture." N.Y. Pen. L. 240.20(3). The charging instrument against Provost described the behavior as the basis for his arrest thus:

> [D]efendant did intentionally use abusive and obscene language in a public place—the police department lobby, saying to civilian police department employee Dave Fisher "I don't have time for your bullshit" and "I can't jerk around

all day like you." Defendant did engage in this behavior in view of several civilian persons in the lobby.

Provost was detained for about two and a half hours. The charge was ultimately dismissed pursuant to N.Y.Crim. Pro. L. § 170.55.[4]

*The Trial*

Provost filed suit under 42 U.S.C. § 1983, alleging that Roper, Sorrentino, and Otero deprived him of his rights under the First and Fourth Amendment as applied to the Newburgh police officers through the Fourteenth Amendment by retaliating against him in response to the exercise of his right to free speech, subjecting him to a seizure by false arrest and imprisonment, and inflicting excessive force on him during the arrest.

The case went to trial on February 14, 2000 before Magistrate Judge Yanthis.[5] Provost takes exception to three aspects of the trial. First, in support of his effort to obtain damages for emotional distress, Provost wished to testify about the instances of police brutality toward other detainees that he claimed to have witnessed during his incarceration. The defendants' counsel objected to this testimony and the court apparently issued its ruling excluding it at a sidebar that took place off the record. Provost was thus prevented from so testifying, but his counsel later noted his objection for the record, claiming that such evidence "would have been relevant . . . on the issue of emotional distress, post-traumatic stress, suffered by the plaintiff."

Second, Provost objected to the following portion of the court's instructions on punitive damages:

---

4. N.Y.Crim. Pro. L. § 170.55 provides for an "adjournment in contemplation of dismissal."

5. The trial was presided over and judgment entered by Magistrate Judge Yanthis pursuant to 28 U.S.C. § 636(c).

The extent to which a particular sum of money will adequately punish the defendant and the extent to which a particular sum will adequately deter or prevent future misconduct may depend upon the financial resources of the defendant against which damages are awarded. Therefore, if you find that punitive damages should be awarded against the defendant, you may consider the financial resources of the defendant in fixing the amount of such damages.

Provost unsuccessfully argued that this language was improper because the defendants had not presented any evidence of their financial circumstances.

Third, during its deliberations, the jury sent a note to the court asking three questions: "Who pays punitive damages?", "Does it come out of defendant's personal income?", and "Who receives punitive damages?" Over Provost's objections, the court answered these questions by explaining to the jury that "[i]f you make an award of punitive damages against any individual defendant, in accordance with my instructions, that individual defendant pays the punitive damages," and that "[a]ny such award of punitive damages is the personal responsibility of the individual defendant." Provost requested that the court instruct the jurors "that they not concern themselves with who pays punitive damages."

Before the case was sent to the jury, the defendants moved orally for judgment under Fed.R.Civ.P. Rule 50(a) on the grounds, *inter alia*, that there was probable cause for Provost's arrest as a matter of law, that Provost's statements at the police station were not protected by the First Amendment, and that Lieutenant Sorrentino was not liable as a matter of

law because he was not personally involved in the arrest. The motion did not address the defendants' claims that they were entitled to qualified immunity. The district court reserved decision and sent the case to the jury, which returned a verdict for Provost, finding that both Roper and Sorrentino had violated his constitutional rights to free speech and to be free from arrest without probable cause and that neither defendant was entitled to qualified immunity.[6] The jury awarded Provost a total of $20,002 in damages: one dollar in nominal damages against each responsible defendant for both violations and $10,000 in punitive damages against each for the unlawful arrest.

*Post–Trial Motions and the Decision Below*

On February 24, 2000, the defendants renewed their motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b). They again argued that Sorrentino was entitled to judgment as a matter of law because the evidence at trial did not support a finding that he was directly involved in the arrest. The motion further requested judgment as a matter of law in favor of both Roper and Sorrentino on the ground that the officers had probable cause to arrest the plaintiff for disorderly conduct and therefore had not committed a constitutional violation. Again, they did not mention their claim of qualified immunity. In the alternative, the defendants sought a new trial under Fed.R.Civ.P. 59 on the grounds that the verdict was against the weight of the evidence and that the punitive damage amount was excessive.

On May 18, 2000, the district court denied the defendants' motions in all respects

---

**6.** The jury found in favor of defendant Otero on all counts. The judgment of the trial court in this regard was not appealed.

but one: It held that Sorrentino was entitled to judgment as a matter of law because "there was no evidence that [he] participated directly in plaintiff's arrest or that he ... was grossly negligent or deliberately indifferent" with respect to Provost's rights. Accordingly, the court dismissed the complaint as to Sorrentino and entered judgment against Roper in the amount of $10,001.

Provost appealed that dismissal as well as the three aspects of the trial proceedings to which he objected. Roper cross-appealed the court's denial of his motions for judgment as a matter of law.

## DISCUSSION

I. Provost's Appeal from the Grant of Judgment as Matter of Law to Sorrentino

Provost first argues that the district court erred in dismissing his claims against Lieutenant Sorrentino based on its finding that Sorrentino was not personally involved in the disputed arrest.

We review a district court's grant of a motion for judgment as a matter of law *de novo, see Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000), applying the same standard that the district court itself was required to apply, *see LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995). As the district court recognized, "[j]udgment as a matter of law may not properly be granted [to Sorrentino] under Rule 50 unless the evidence, viewed in the light most favorable to [Provost], is insufficient to permit a reasonable juror to find in [Provost's] favor." *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998).

The court also correctly noted that "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir. 1991)). In the circumstances of this case, Provost could have demonstrated such personal involvement by a supervisory defendant such as Sorrentino by establishing to the satisfaction of the jury that Sorrentino (i) personally participated in the alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

We also must apply this standard in the context of a Rule 50 motion for judgment as a matter of law. Thus, the issue is whether, viewing the evidence in the light most favorable to Provost, a reasonable juror could have concluded that Sorrentino's conduct satisfied any one of these criteria.

We turn first to the issue of Sorrentino's personal participation in the violation. Our opinions have sometimes used the phrase "direct participation" to describe one sort of behavior that will result in a defendant's liability under § 1983. *See, e.g., Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (stating that personal involvement may be established through "direct participation"); *Moffitt,* 950 F.2d at 886 (same); *Wright,* 21 F.3d at 501 (defendant may be liable if he "directly participated" in the alleged infraction); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (same). This phrase, "direct participation," however, does not precisely describe what must be shown to render the defendant liable. Its use can lead both to overinclusion and underinclusion.

The potential for overinclusion results from the phrase's failure to make clear that the direct physical participation of the defendant in the constitutional violation is not alone a sufficient basis for holding the defendant liable if the defendant had no awareness or notice of the facts that rendered the action illegal. If, for example, a defendant police officer arrests a person pursuant to an apparently valid arrest warrant but, unbeknownst to the defendant, the arrest warrant was procured through perjurious affidavits of other police officers motivated by racial bias, the defendant might be said to have "participated directly." But such innocent participation in the arrest cannot make him liable for its illegality.

Thus, what we have meant by using phrases such as "direct participation" as a basis of liability is personal participation by one who has knowledge [7] of the facts that rendered the conduct illegal. *See Gaston v. Coughlin,* 249 F.3d 156, 165–66 (2d Cir.2001) (allegation of two defendants' "actual knowledge" of prison conditions showed sufficient personal involvement to defeat summary judgment); *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) (finding personal involvement where prison official issued order of permission for inmates to abuse plaintiff, though he was not present during the alleged abuse); *Moffitt,* 950 F.2d at 886 (finding that personal involvement "may be premised upon [defendants'] alleged knowledge" of the unconstitutional conduct "and a resulting direct participation therein"); *Meriwether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989) (finding personal involvement where defendant gave instructions that prisoners be transferred and the jury could "infer that he knew" retaliation against plaintiffs would likely result); *Wright v. McMann,* 460 F.2d 126, 134–35 (2d Cir.1972) (affirming damage award based on evidence of the defendant's "actual knowledge" of segregation cell conditions). In contrast, we have found no liability where the defendant lacked actual knowledge. *See, e.g., Wright,* 21 F.3d at 501 (finding no liability where officials lacked notice or knowledge of the alleged unconstitutional confinement).

Use of the phrase "direct participation" can also lead to underinclusion, depending on the meaning one attributes to the word "direct." We think that the significance of the word is to distinguish "direct" participation from other bases of liability, such as grossly negligent supervision or deliberate indifference to a victim's rights. It does not foreclose the liability of a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be "indirect"—such as ordering or helping others to do the unlawful acts, rather than doing them him—or herself.

■ Thus, as we understand it, "direct participation" as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew [8] of the facts rendering it illegal.

■ We therefore examine, applying this standard, the facts pertinent to Lieutenant Sorrentino's liability, seen in the light most favorable to Provost. Sorrentino was present in the police headquarters acting in a supervisory role throughout these events. He became aware of a problem between Provost and the desk clerk on the other side of the bullet-proof window; he told Roper to go "handle" the matter;

---

7. We express no view as to whether it includes also one who should have known.

8. Or perhaps should have known, the issue we do not reach.

and he was in the hallway standing a few feet behind Roper while Roper conversed with Provost and made the arrest. Provost had no evidence beyond this capable of showing Sorrentino's awareness of the facts surrounding Roper's arrest of Provost.

This evidence is insufficient to serve as a basis for a reasonable juror to conclude that Sorrentino had knowledge of the activities of the arresting officer and participated in them. *See Moffitt*, 950 F.2d at 886. Because the evidence fails to show that Sorrentino was aware of the facts that made the arrest unconstitutional, the jury could not hold Sorrentino liable on the basis of his personal involvement in the illegal arrests.

■ When "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," *DiSanto v. McGraw–Hill, Inc./Platt's Div.*, 220 F.3d 61, 64 (2d Cir.2000) (internal quotation marks omitted), or "pure guess-work," *Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 112 (2d Cir.1996), *cert. denied*, 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997), we are required to grant a motion for judgment as a matter of law. The jury's conclusion that Sorrentino was personally involved in Provost's arrest based on Provost's testimony and on inferences drawn therefrom was, at best, the result of such speculation. The district court therefore properly granted the defendants' Rule 50 motion on this issue.

■ We also agree with the district court that the evidence does not justify an inference either that Sorrentino was grossly negligent in supervising Roper or that

he could be said to have been deliberately indifferent to Provost's rights. The jury could reasonably have found that Roper acted for legally impermissible reasons and without legal reasonableness in arresting Provost. But the evidence did not show that Sorrentino knew or should have known of the reasons underlying Roper's decision or of the facts that made it illegal. Absent such evidence, there is no basis for finding that Sorrentino was either grossly negligent in supervising Roper or was deliberately indifferent to a violation of Provost's rights by an officer under Sorrentino's supervision.

In any event, Provost apparently did not seek to base Sorrentino's liability on his role as Roper's supervisor until Provost responded to Sorrentino's Rule 50(b) motion for judgment as a matter of law after trial.[9] The only theory of liability on Sorrentino's part presented to the jury was his alleged personal participation in the arrest. The question of supervisory liability was therefore not properly before the district court on the post-trial motion and is not properly before us on appeal.

## II. Roper's Appeal from the Denial of Judgment as a Matter of Law

### A. Probable Cause

In his cross-appeal, Roper first argues that the district court erred in failing to overturn as a matter of law the jury's conclusion that he did not have probable cause to arrest Provost for disorderly conduct.

"A § 1983 claim for false arrest[ ] rest[s] on the Fourth Amendment right of an individual to be free from unreasonable

---

**9.** Provost has not asserted that Sorrentino was liable to Provost because of Sorrentino's duty as a law enforcement official "to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994); *see also O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988).

seizures." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996). "The existence of probable cause to arrest constitutes justification and is a complete defense to" such a claim. *Id.* Probable cause exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* Because this issue arises in the context of Roper's Rule 50 motion for judgment as a matter of law, the evidence must be viewed in the light most favorable to Provost. The question before us is whether the evidence, viewed in that light, could reasonably support the jury's conclusion that Roper did not have probable cause to arrest him for disorderly conduct. *See Galdieri–Ambrosini*, 136 F.3d at 289. In other words, the issue is whether there is "such an overwhelming amount of evidence" demonstrating the existence of probable cause that "reasonable and fair minded [persons] could not arrive at a verdict against" Roper. *DiSanto*, 220 F.3d at 64 (internal quotation marks omitted); *see also Gagnon*, 696 F.2d at 20 ("[A]ppellant[ ] must show that no reasonable jury could fail to find that the officers had probable cause."). We conclude that there is not.

■ To prove the crime of disorderly conduct under N.Y. Pen. L. § 240 .20 [10] the prosecution must establish three elements:

(i) the defendant's conduct must be "public" in nature, (ii) it must be done with "intent to cause public inconvenience, annoyance or alarm" or with recklessness as to "a risk thereof," and (iii) it must match at least one of the descriptions set forth in the statute. Thus, Roper was "warranted in believing that [Provost] had committed or was in fact committing the crime of disorderly conduct," *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 414 (2d Cir. 1999), and therefore had probable cause to arrest, only if a reasonable person in the same circumstances would have believed that Provost's conduct satisfied all three components of §. 240.20. We conclude that the jury could rationally have found that Roper did not have such a reasonable belief as to two of the elements of disorderly conduct.

■ *1. The Public Conduct Requirement.* The New York disorderly conduct statute punishes "disruptive behavior ... of public rather than individual dimension." *People v. Munafo*, 50 N.Y.2d 326, 331, 406 N.E.2d 780, 783, 428 N.Y.S.2d 924, 926 (1980). "The clear aim was to reserve the disorderly conduct statute for situations that carr[y] beyond the concern of individual disputants to a point where they ... become a potential or immediate public problem." *Id.*

■ It is undisputed that the incident occurred in the police station, that six or

**10.** Section 240.20 reads in its entirety:
Disorderly conduct
A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:
1. He engages in fighting or in violent, tumultuous or threatening behavior; or
2. He makes unreasonable noise; or
3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or

4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or
5. He obstructs vehicular or pedestrian traffic; or
6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or
7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.
Disorderly conduct is a violation.

seven members of the public were in the waiting room, and that a number of police officers were present in the station. We agree with Roper that as a matter of law, Provost's conduct was sufficiently public to trigger the disorderly conduct statute.

■ *2. The Intent Requirement.* Roper's argument fails, nonetheless, first, on the independent *mens rea* element of § 240 .20. The disorderly conduct statute requires that the defendant act with "intent to cause public inconvenience, annoyance or alarm" or with recklessness "creating a risk thereof." N.Y. Pen. L. § 240.20. The question, then, is whether "no reasonable jury could fail to find that [Roper] had probable cause to believe that [Provost] acted with wrongful intent." *Gagnon,* 696 F.2d at 20.

It is true that Provost testified that he "banged on the glass," and "hollered," and "yelled through the window." But, viewing the evidence in the light most favorable to Provost, there is no reason to believe he did these things with any purpose other than to communicate with Fisher through the thick, bullet proof, glass partition. It was the clear thrust of Provost's testimony that Fisher either did not hear him or ignored him by pretending not to hear him, and that he raised his voice in order to be heard.

Provost's testimony was also supported by Roper, who testified that a person would have to "raise [his] voice to communicate" through the bullet-proof glass at the police station and that "[i]t's normally very difficult to hear people that are speaking in a normal tone of voice." Another police officer testified similarly. The jury could reasonably have concluded that Roper knew that Provost's "holler[ing]" and "yell[ing] through the window" was for the legitimate purpose of getting the desk officer's attention, not to cause "public inconvenience, annoyance or alarm."

The issue here is thus not unlike that in *Gagnon v. Ball,* where we refused to overturn a jury verdict against two Connecticut officers who had arrested a woman as she sought their assistance in apprehending an alleged "flasher" who was apparently fleeing the crime scene. *See* 696 F.2d at 19. Despite "uncontroverted evidence showing that [the plaintiff] was shouting and using rough language in a public area," we held that in light of the officers' concessions at trial that they were aware of the circumstances prompting the plaintiff's boisterous behavior, it was "a fair jury question as to whether the officers lacked probable cause" regarding the intent element of the materially identical Connecticut disorderly conduct statute. *Id.* at 20. Although the facts of *Gagnon* are substantially different from those of the case at bar, the underlying principle is relevant to this appeal: an officer who concedes the possibility that there were justifiable reasons for disruptive conduct underlying a plaintiff's arrest is hard-pressed to establish that he had probable cause as a matter of law on the intent element of § 240.20. Here, as in *Gagnon,* "[t]he jury was entitled to conclude that [the arresting] officers were aware of [the plaintiff's] legitimate reason for shouting, but arrested [him] nonetheless." *Gagnon,* 696 F.2d at 20.

*3. Statutory Provisions.* Even if Roper reasonably believed that Provost's behavior met these two general requirements of § 240.20, he cannot succeed on his probable cause argument unless no rational jury could disagree that he was warranted in believing that Provost's conduct fit one of the specific descriptions of conduct set forth in the disorderly conduct statute. Once again, we must view the evidence in the light most favorable to Provost.

■ Of the seven subdivisions of § 240.20, only (2) and (3) arguably apply to

this case. Subdivision (2) provides that a person is guilty of disorderly conduct when, with the requisite intent or recklessness with regard to public inconvenience or annoyance, "[h]e makes unreasonable noise." N.Y. Pen. L. § 240.20(2). The term "unreasonable noise" means "a noise of a type or volume that a reasonable person, under the circumstances, would not tolerate." *People v. Bakolas,* 59 N.Y.2d 51, 53, 449 N.E.2d 738, 740, 462 N.Y.S.2d 844, 846 (1983). Provost conceded that he banged on the glass and that he yelled and hollered through the window. He also answered "yes" to the question whether he had "become noisy." But the words "bang on the glass" and "yell" and "holler" cover a range of volume. The jury was not required to infer that Provost was making "unreasonable noise" as required by the statute for him to have been engaging in disorderly conduct. This is especially true in view of Roper's concession, confirmed by another police officer, that one would need to speak loudly to be heard though the thick bulletproof glass in front of the clerk's desk.

Viewing all this evidence in the light most favorable to Provost, we conclude that a jury could reasonably find that Provost raised his voice and "banged on the glass" only to the extent it was necessary to do so to be heard and that the noise he made was not "unreasonable" in the circumstances and that Roper understood as much.

Roper testified, moreover, that he did not decide to arrest Provost until after Provost had gone into the back of the station. The jury could rationally have found on that basis that Roper did not believe Provost made unreasonable noise when he banged on the glass and hollered through the slot in the window. Instead, a reasonable jury could have found that Roper's testimony about Provost's noisiness was a pretext developed after the fact and that Roper really arrested Provost in retaliation for the angry, insulting attitude Provost exhibited after he had been summoned by Roper into the hallway. The jury could have found, in other words, that Roper's decision to arrest Provost was an abuse of power and that Roper's claim that Provost made a public disturbance was a falsification.

 Subdivision (3) of § 240.20, the provision under which Provost was in fact charged, makes it 'a violation for a person who, "[i]n a public place, . . . uses abusive or obscene language, or makes an obscene gesture" if his behavior satisfies the other elements of disorderly conduct. At least one of the officers who witnessed Provost's actions stated that there was "nothing . . . aggressive" or "threatening" about his behavior. Roper himself admitted that he did not see Provost make any obscene gestures. And although several officers testified that Provost used obscene and "aggressive" language, Provost denied having done so. The jury was free to credit Provost's testimony and not the officers', thus concluding that probable cause was absent. And if on any rational view of the evidence, the jury's verdict could be sustained, we are obligated to accept that view, rejecting Roper's effort to overturn the jury's verdict.

 Even if the jury had chosen to credit the officers' account of Provost's language, moreover, that language could not be the basis for a valid arrest because, as the district court concluded and the defendants do not dispute on appeal, it was constitutionally protected. "Only 'fighting words' directed at police officers can be criminalized, and the 'fighting words' doctrine is probably 'narrower [in] application in cases involving words addressed to a police officer, because a properly trained officer may reasonably be expected to ex-

ercise a higher degree of restraint than the average citizen.'" *Posr,* 180 F.3d at 415 (quoting *City of Houston v. Hill,* 482 U.S. 451, 462, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)). "Fighting words must tend to incite an *immediate* breach of the peace." *Id.* (emphasis in original). Because Provosts' language by all accounts did not meet this "fighting words" standard, his speech was protected by the First Amendment. And "First Amendment protection means, of course, that an utterance [could] not have been the basis for a legitimate arrest, which in turn means that [Roper] would not have been justified in believing that [Provost's] comment[s] warranted arrest for disorderly conduct." *Id.* at 416. The jury thus could reasonably have concluded that Roper did not have probable cause to believe that Provost's behavior fit within § 240.20(3).

Because a reasonable jury could have found that Roper lacked probable cause on two of the elements of a charge of disorderly conduct, we conclude that the district court properly denied Roper's motion for judgment as a matter of law on this ground.

*B. Qualified Immunity*

Roper next argues that even if he did not have probable cause to arrest Provost, he nonetheless has a valid defense under the doctrine of qualified immunity. He contends that the jury erred in concluding that he was not entitled to this defense and requests that we overturn that conclusion as a matter of law.

 "In general, public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Weyant,* 101 F.3d at 857. In an unlawful arrest action, an officer is immune if he has "'ar-

guable' probable cause," *Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997), and is subject to suit only if his "judgment was so flawed that no reasonable officer would have made a similar choice." *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995). This forgiving standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Qualified immunity "serves important interests in our political system," *Sound Aircraft Servs., Inc. v. Town of East Hampton,* 192 F.3d 329, 334 (2d Cir.1999), chief among them to ensure that damages suits do not "unduly inhibit officials in the discharge of their duties" by saddling individual officers with "personal monetary liability and harassing litigation." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). *Cf. Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972) ("[E]ven learned and experienced jurists have had difficulty in defining the rules that govern a determination of probable cause.... As he tries to find his way in this thicket, the police officer must not be held to act at his peril.").

Roper would have been entitled as a matter of law to qualified immunity if the evidence, viewed in the light most favorable to Provost, established that it was objectively reasonable for Roper to believe he was justified in making the arrest. It may well be, for the reasons set forth above, that the jury could reasonably have found (i) that there was no basis to believe Provost was making unreasonable noise, (ii) that Roper did not have such a belief, and (iii) that Roper's testimony to the contrary was nothing more than a pretext to cover up an unjustified act of abuse of power. If the jury could so find, Roper would not be entitled to qualified immunity as a matter of law.

We need not resolve the merits of Roper's qualified immunity argument, however, because he forfeited any right to judgment under Rule 50 on this basis. Although qualified immunity was very much a part of the case from the time of the defendants' answer until the jury verdict, Roper failed to include that issue in his motions for judgment as a matter of law at the conclusion of trial. At the close of the evidence, Roper requested judgment as a matter of law on his Rule 50(a) motion only on the basis of what he contended was probable cause for Provost's arrest and his assertion that Provost's shouting was unprotected by the First Amendment. He renewed that motion after the verdict pursuant to Rule 50(b), again arguing that there had been no constitutional violation on the merits because he had probable cause to arrest Provost as a matter of law. At no time did Roper request judgment as a matter of law on qualified immunity grounds, and the district court therefore did not address any such argument in the ruling from which he now appeals.

Roper's request that we overturn the verdict and enter judgment for him on the basis of qualified immunity thus confronts two procedural obstacles. The first is the familiar rule that "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *see also Gwozdzinsky v. Magten Asset Mgmt. Corp.*, 106 F.3d 469, 472 (2d Cir.1997) ("[W]e will not decide an issue on appeal not first presented to the district court."). Because Roper first raised the argument that he was entitled to qualified immunity *as a matter of law* in his initial brief on appeal, this rule appears to preclude his attempt to assert the defense at this stage of the litigation.

The second hurdle is Fed.R.Civ.P. 50 itself, which sets forth the procedures by which parties may seek judgment as a matter of law in the district court. That rule allows a party to request judgment as a matter of law after the trial under Fed. R.Civ.P. 50(b) only if it sought such relief before the jury retired to deliberate under Fed.R.Civ.P. 50(a)(2), and limits the permissible scope of the later motion to those grounds "specifically raised in the prior motion for [judgment as a matter of law]." *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993); *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir.1997) ("In sum, a posttrial motion for judgment as a matter of law can properly be made only if, and to the extent that, such a motion specifying the same grounds was made prior to the submission of the case to the jury.").

Because Roper did not specifically include a qualified immunity argument in his pre-verdict request for judgment as a matter of law, he could not have included such an argument in his post-verdict motion even had he attempted to do so. *See Lambert v. Genesee Hosp.*, 10 F.3d 46, 54 (2d Cir.1993) ("[T]he specificity requirement is obligatory."), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). Absent such a motion that includes the specific grounds for relief, this Court is "without power to direct the District Court to enter judgment contrary to the one it had permitted to stand." [11] *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 395 (2d Cir.1980) (internal quotation marks omitted); *see also Pittman v. Grayson*, 149 F.3d 111, 119 (2d Cir.1998) (noting

---

11. Judge Newman contends in his dissent that Roper's obligation to move for judgment as a matter of law on the issue of qualified immunity was moot because Provost's attorney had sought judgment as a matter of law on the issue and the court had denied the motion, explaining that there were "factual issues for the jury." He argues that because

that it is "well established" that a party cannot seek judgment as a matter of law on appeal "on a given issue unless it has timely moved in the district court for" such relief); *McCardle,* 131 F.3d at 50 ("[T]he defense [of qualified immunity] cannot properly be decided by the court as a matter of law unless the defendant moves for judgment as a matter of law ... in accordance with Fed.R.Civ.P. 50.").

■■■ We may excuse these procedural errors only to prevent a "manifest injustice." *McCardle,* 131 F.3d at 52; *see also Samuels,* 992 F.2d at 15 ("Relief from the [Rule 50] specificity requirement is available only to avoid 'manifest injustice' to the moving party.") (quoting *Baskin v. Hawley,* 807 F.2d 1120, 1130 (2d Cir.

1986)); *Schmidt v. Polish People's Republic,* 742 F.2d 67, 70 (2d Cir.1984) ("While th[e] bar to raising new issues on appeal is not absolute, it may be overcome only when necessary to avoid manifest injustice.") (citation omitted). We do not perceive such injustice in this case. As noted above, it is doubtful that Roper was entitled to qualified immunity as a matter of law, since the evidence would have reasonably supported a finding that he acted abusively without even a belief that the arrest was justified.

### III. Provost's Other Allegations of Error

Because we cannot dismiss Roper on the grounds advanced in his cross-appeal, we

---

the trial judge had made clear that there were "factual issues for the jury," that ruling effectively answered the motion that Roper's counsel might have made.

We respectfully disagree. The motion that Roper's counsel failed to make would have been directed to different evidence, viewed in a different light. We think that the denial of Provost's motion for judgment as a matter of law as to qualified immunity with the statement that there are "issues of fact"—a decision made by the trial court some time after the defendants had made their judgment as a matter of law motion on various bases other than qualified immunity—gave defendants' counsel no reason to believe that the judge would necessarily have denied a motion for judgment as a matter of law for Roper on the basis of qualified immunity had they made one.

When Provost moved for judgment as a matter of law to remove the claim of qualified immunity from the charge to the jury, he was arguing that on the evidence most favorable to Roper, drawing all reasonable inferences favorable to him, the jury must find that Provost's conduct could not justify Roper's belief that he could properly arrest Provost.

When the court denied the motion explaining that there were factual issues for the jury, the court was saying, in effect, that there is evidence in the case from which the jury could find Provost created a sufficient distur-

bance to warrant a reasonable officer's arresting him. The court could have made this ruling by considering nothing more than Roper's own testimony that Provost had made a major ruckus. The court had no need to consider any other evidence or any other question.

Had Roper then made the motion he did not make—seeking judgment as a matter of law *in Roper's* favor on the question of qualified immunity—he would have been making a different argument, based on different evidence, viewed in a different light. Roper would have argued that, viewing the evidence in the light most favorable *to Provost,* the jury was required to find that Provost's conduct *did* justify Roper in his belief that he could properly arrest Provost. Now the judge would be required to look at different evidence. Roper's testimony, which adequately answered Provost's motion, would not be helpful on Roper's motion. Roper's argument would need to address Provost's testimony, drawing all reasonable inferences in Provost's favor. He would argue, "Provost has admitted he banged the glass and hollered through the window. On that basis, you must find enough disturbance to justify Roper's belief that he could properly make an arrest."

We think that the ruling the judge made in Provost's motion gave little basis for counsel to predict how the judge would rule on Roper's motion had it been made.

must address Provost's challenges to three aspects of the trial proceedings. We conclude that although one such challenge demonstrates error, none requires reversal.

## A. Evidentiary Ruling

■ Provost first appeals the district court's refusal to allow his proffered testimony describing the alleged abuse of other detainees that he claimed to have witnessed while incarcerated at the Newburgh police station. We reject this challenge. "Decisions to admit or exclude evidence are reviewed for abuse of discretion and are overturned only where arbitrary or irrational." *United States v. Han,* 230 F.3d 560, 564 (2d Cir.2000). The district court acted well within its "broad discretion," *Gentile v. County of Suffolk,* 926 F.2d 142, 151 (2d Cir.1991), in concluding that the disputed testimony was either irrelevant to the plaintiff's claims—there is no evidence that any of the defendants took part in the alleged misconduct—or that any relevance was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R.Evid. 403.

## B. Punitive Damages Instruction

■ Provost next objects to the court's jury instructions on punitive damages, the relevant portion of which read:

The extent to which a particular sum of money will adequately punish the defendant and the extent to which a particular sum will · adequately deter or prevent future misconduct may depend upon the financial resources of the defendant against which damages are awarded. Therefore, if you find that punitive damages should be awarded against the defendant, you may consider the financial

resources of the defendant in fixing the amount of such damages.

Emphasizing that the defendants did not present any evidence of their financial circumstances, Provost argues that this instruction was erroneous and prejudicial.

■ We agree with the first part of Provost's argument: The disputed portion of the punitive damages instruction was erroneous. Although 42 U.S.C. § 1983 "allow[s] juries and courts to assess punitive damages ... against the offending official[ ] based on his personal financial resources," *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 269, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), "[u]nder well established precedent in this Circuit, 'it is the defendant's burden to show that his financial circumstances warrant a limitation of the award.'" *Mathie v. Fries,* 121 F.3d 808, 816 (2d Cir.1997) (quoting *Smith v. Lightning Bolt Prods, Inc.,* 861 F.2d 363, 373 (2d Cir.1988)). The duty then is on the defendant to present evidence, before the jury renders its verdict and on appeal therefrom, of his limited resources if he wishes that factor to be weighed in the calculation of punitive damages. *See Zarcone v. Perry,* 572 F.2d 52, 56 (2d Cir.1978) ("[T]he decided cases and sound principle require that a defendant carry the burden of showing his modest means [by] facts peculiarly within his power if he wants this considered in mitigation of damages."); *cf. Fishman v. Clancy,* 763 F.2d 485, 490 (1st Cir.1985) (declining to overturn a jury verdict where the defendants "failed to create a record of their financial capabilities"); *Tri–Tron Int'l v. Velto,* 525 F.2d 432, 438 (9th Cir.1975) (refusing to "interfere with [a punitive damages] award" because the defendants "offered no evidence on their financial ability to pay"); *El Ranco, Inc. v. First Nat'l Bank of Nevada,* 406 F.2d 1205, 1218–19 (9th Cir.

1968) (same), *cert. denied,* 396 U.S. 875, 90 S.Ct. 150, 24 L.Ed.2d 133 (1969).

In this case, the defendants did not present evidence of their financial circumstances, and the court therefore should not have instructed the jury to consider that issue in calculating a punitive award. *See Lee v. Edwards,* 101 F.3d 805, 813 (2d Cir.1996) (noting that the jury properly did not weigh the defendant's financial resources in determining a punitive award because of the defendant's "tactical error" in failing to present relevant evidence). By doing so, the court not only relieved the defendants of their burden in this regard, but also left the jurors to speculate about the depth of the pockets from which the punitive damages would come.

■ We disagree with Provost, however, that this error was prejudicial. The jury, although finding that Provost suffered no compensable injury, awarded him $10,000 in punitive damages against Roper based on a one dollar award of nominal damages. His contention that he has been prejudiced by the jury's unwillingness to give him more than that as a result of the court's erroneous instruction runs headlong into our duty to "make certain that . . . punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992) (internal quotation marks omitted). Because the defendants have not raised the issue, we of course do not decide whether the jury's award is "grossly excessive" in violation of the Due Process Clause of the Fourteenth Amendment. *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). But we note that on the particular facts and circumstances of this case and under the criteria set forth in *Gore,* 517 U.S. at 575–85, 116 S.Ct. 1589 (instructing courts to review excessiveness by reference to the reprehensibility of the tortious conduct, the ratio of punitive to compensatory damages, and the difference between the award and other civil penalties imposed or authorized in similar cases), the $10,000 punitive damages sum approaches the limits of what we would deem consistent with constitutional constraints. It follows that Provost could not have been harmed by the disputed instruction. The court's error does not warrant a new trial. *See United States v. Masotto,* 73 F.3d 1233, 1238 (2d Cir.) ("An erroneous instruction requires a new trial unless the error is harmless."), *cert. denied,* 519 U.S. 810, 117 S.Ct. 54, 136 L.Ed.2d 18 (1996).

*C. Answers to Jury Questions*

■ Finally, we reject Provost's third and final argument on appeal: that reversal and remand is required because the court erred in responding to a jury question that the defendants would be personally responsible for paying a punitive damages award. As we have observed, because additional punitive damages were unwarranted, any error could not have been prejudicial.

**CONCLUSION**

The district court properly granted the defendants' motion for judgment as a matter of law with respect to Sorrentino and correctly denied it in all other respects. The court also acted within its discretion in excluding Provost's proffered evidence on the emotional distress he suffered as a result of witnessing police brutality at the Newburgh police station. Although the court erred in instructing the jury that it could consider the defendants' financial circumstances in calculating punitive damages in the absence of the presentation by Roper of any relevant evidence on that issue, this error was harmless. We there-

fore affirm the judgment of the district court in all respects.

**JON O. NEWMAN, Circuit Judge, dissenting (as to Defendant Roper):**

The majority affirms a judgment requiring Police Officer John Roper to pay $10,000 in punitive damages because his lawyer neglected to include qualified immunity among the grounds for seeking judgment as a matter of law. Because I believe that under the circumstances of this case it is unfair to consider Roper's qualified immunity defense forfeited and because I believe the defense is valid as a matter of law, I respectfully dissent.

*Provost's conduct.* The key facts entitling Roper to the defense of qualified immunity are not disputed. Robert Provost, owner and operator of a halfway house, came to the Newburgh police station in an effort to retrieve a halfway house resident believed to be there. On five occasions during a one-hour interval, he asked at the reception window of the public waiting area to have the resident produced. He was told to wait. Six or seven people were seated in the waiting area.

In trial testimony, Provost described his own conduct as follows. "I hollered through...a little slit underneath" the glass window. "I ... banged on the glass." "I yelled through the window." In response to the question, "Is it your recollection now that you did become noisy at some point?" Provost answered, "The fifth time.... Yes, yes."

Roper and his supervisor, Lieutenant Patrick Sorrentino, were standing together in a room behind the glass window, 25 to 30 feet from the officer at the window. Roper and Sorrentino were discussing one of Roper's reports. Both were in the identical position to see Provost at the window and to hear Provost's yelling. Sorrentino told Roper to "go and handle the problem." Roper testified, without dispute by Provost, that once he realized that Provost was not going to calm down, he placed Provost under arrest for disorderly conduct. Sorrentino was standing behind Provost when the arrest occurred and took no action to prevent it.

*Probable cause to arrest.* On these undisputed facts, there is a substantial argument that probable cause existed for Provost's arrest. Even if, as the majority points out, it is necessary to raise one's voice somewhat to be heard through the slit in the window, Provost's undisputed conduct in yelling, hollering, banging on the glass, and becoming even noisier on the fifth occasion than on the prior occasions sufficed "to warrant a person of reasonable caution in the belief that [Provost] ha[d] committed ... a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). New York law defines disorderly conduct to include a person who "makes unreasonable noise" "recklessly creating a risk" of "public ... annoyance." N.Y. Pen. L. § 240.20(2) (McKinney 2000).[1]

1. The majority concludes that probable cause could reasonably be found lacking because the *mens rea* and conduct elements of section 240.20 could reasonably be found lacking. As to *mens rea,* the majority focuses on the requirement of acting with *"intent* to cause public inconvenience, annoyance or alarm," N.Y. Pen. L. § 240.20 (emphasis added), ignoring the alternative mental state of *"recklessly* creating a risk thereof," *id.* (emphasis

added), which is what Provost did. As to conduct, the majority concludes that "[t]he jury was not required to infer that Provost was making 'unreasonable noise' as required by the statute for him to have been engaging in disorderly conduct." This might be an appropriate observation if we were reviewing Provost's conviction for the criminal offense. The issue for us, however, is not whether he *was* making unreasonable noise, but only

*Qualified immunity.* Even if, under the majority's meticulous parsing of the disorderly conduct statute, probable cause did not exist as a matter of law, the defense of qualified immunity was unquestionably established. As the majority acknowledges, the defense is available if the officer has " 'arguable' probable cause," *Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997), and he may not be required to pay money damages for making an arrest unless his "judgment was so flawed that no reasonable officer would have made a similar choice." *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995). In my view, there was undoubtedly "arguable" probable cause, and many, perhaps most, reasonable police officers would have made the same arrest decision that Roper made.

*Waiver of qualified immunity defense.* Nevertheless, the majority declines to accord Roper the defense of qualified immunity because it rules that he forfeited the defense at trial. My disagreement requires a full understanding of the pertinent circumstances.

The Defendants asserted the defense of qualified immunity in their answer. At the close of the evidence, counsel for the Defendants moved for judgment as a matter of law ("JMOL") on the ground that the undisputed facts established probable cause for the arrest.[2] The majority rules that a forfeiture occurred because counsel did not amplify his motion by saying, "Your honor, not only do the undisputed facts establish probable cause, but, in addition, they also show that it was objectively reasonable for officer

Roper to believe that these undisputed facts established probable cause." Despite that omission, the issue of qualified immunity was raised before the trial judge when counsel for Provost asked to have the qualified immunity defense removed from the proposed jury charge on the ground that there were no "questions of fact [that] need to be resolved by the jury." The Court denied the request, stating, "I do find there's factual issues for the jury, and I will be giving them a qualified immunity instruction."

In ruling that Roper forfeited the qualified immunity defense, the majority is faulting his counsel for not getting up at that point and saying, "Your Honor, I realize that you have just denied the Plaintiff's motion for judgment as a matter of law on our qualified immunity defense, but technically, in making that ruling, you had to consider the undisputed facts viewed from the Defendants' standpoint; I now ask you to rule that we are entitled to qualified immunity as a matter of law, viewing the undisputed facts from the Plaintiff's standpoint." I have little doubt that the Magistrate Judge would most likely have replied, "Counsel, didn't you just hear me say that I find there are factual issues for the jury on the qualified immunity defense?" and counsel, apprehensive that a discourse on the technical distinction between a JMOL motion made by a defendant and a JMOL motion on the same issue made by a plaintiff would have incurred at least a reprimand, would have simply said, "Yes, Your Honor" and sat down.[3]

---

whether there was probable cause to believe that he was.

**2.** The motion was renewed after the verdict.

**3.** If the trial judge had denied Provost's JMOL motion on the qualified immunity issue by saying something like "On your motion, I am required to view the evidence from the stand-

point of the Defendants, and doing so, I conclude that factual issues preclude granting your motion," counsel for the Defendants might well have had an obligation to make his own JMOL motion on the qualified immunity issue or risk forfeiture. But the trial judge denied Provost's motion with the general statement that he found that there were factu-

I do not believe the absence of the above colloquy amounts to a forfeiture of Roper's valid defense of qualified immunity. Principles governing the forfeiture of legal rights are not rules of a game to see which party's lawyer has a lower point score when the litigation is completed. They exist to serve legitimate purposes. In the case of the rule governing a JMOL motion, *see* Fed.R.Civ.P. 50, two purposes exist for requiring a party to move at the close of all the evidence that the undisputed facts, viewed from the adversary's perspective, entitle the moving party to judgment (or at least to have a particular issue adjudicated in its favor). The primary purpose is to afford the adversary an opportunity to persuade the trial judge that the adversary should have an opportunity to present additional evidence supporting its side of the issue on which JMOL is sought. *See Leopold v. Baccarat, Inc.*, 174 F.3d 261, 268 n. 6 (2d Cir.1999) (ground not asserted in JMOL motion not considered where adversary had "no opportunity to cure any deficiency in her proof"); *Galdieri–Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 286 (2d Cir.1998). The second purpose is to afford the trial judge an opportunity to simplify the jury's task by removing issues that are not subject to reasonable factual dispute. *See generally*

9 James Wm. Moore *et al.*, Moore's Federal Practice § 50.21[2] (3d ed.2001).

In the pending case, neither purpose is served by enforcing a forfeiture against Roper. Neither at the conference at the close of the evidence nor at any time thereafter has his adversary claimed that he has been denied an opportunity to present any further evidence that would support his side of the qualified immunity issue. Indeed, he argued to the trial judge that, from his standpoint, there were no factual issues on the qualified immunity defense. As for the trial judge, he had a clear opportunity to remove the qualified immunity issue from the jury's consideration and declined to do so.[4]

Other courts have recognized that an issue has been adequately presented in a JMOL motion when it is "inextricably intertwined" with an issue that was presented. *See Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 198 (8th Cir.1995); *see also Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 691 (3d Cir.1993) (issue raised "a bit obliquely" sufficed to warrant consideration on motion for JMOL). In the pending case, whether it was objectively reasonable for Roper to believe that he had probable cause was surely intertwined with the issue of whether he had probable cause.[5] I

al issues for the jury. Although the majority believes that the Magistrate Judge's ruling on Provost's motion "gave little basis for [Roper's] counsel to predict how the judge would rule on Roper's motion had it been made," 262 F.3d at 162 n. 11, I think most lawyers would have no trouble predicting that the motion would have been summarily denied, and few, if any, would have had the temerity to make it, once the judge stated that he thought there were "factual issues for the jury."

4. I have no quarrel with the trial judge's *pre-verdict* decision, since it is often advisable to reserve decision on an issue and obtain jury fact-finding, in the event that an appellate

court disagrees with a post-verdict JMOL ruling. *See Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 166 n. 2 (2d Cir.1980).

5. I recognize that the issue of the reasonableness of an arrest or a search for purposes of a Fourth Amendment inquiry is distinct from the issue of objective reasonableness for purposes of a qualified immunity inquiry, *see Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *cf. Saucier v. Katz*, 531 U.S. 991, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001) (same distinction as to reasonableness of force used in making arrest). My point is that the issues are sufficiently intertwined that a JMOL motion on

acknowledge that in a prior decision our Court has declined to consider a qualified immunity defense where a JMOL motion identified only the issue of ultimate legality of police conduct and not the issue of the officer's objectively reasonable belief in the legality. *See McCardle v. Haddad,* 131 F.3d 43, 52 (2d Cir.1997). But in *McCardle* there had been no mention of qualified immunity in any conference with the trial court, and the defense "would have been difficult to establish." *Id.* In the pending case, the issue was discussed with the trial judge, and the undisputed facts, viewed from the Plaintiff's standpoint, established the defense. Because the rules of civil procedure are to be "administered to secure the just ... determination of every action," Fed.R.Civ.P. 1, I would not deem Roper to have forfeited his qualified immunity defense for lack of meticulous compliance with Rule 50. *See Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.,* 81 F.3d 606, 610 (5th Cir.1996) ("Technical noncompliance with Rule 50(b) may be excused in situations in which the purposes of the rule are satisfied.") (footnote omitted). Nor would I rule that we may not consider the issue for lack of proper presentation in the trial court. Although issues not properly presented in a trial court are sometimes not reviewed on appeal, that is not an absolute rule, and we frequently consider such issues. Moreover, in this case, the qualified immunity issue was presented to the trial court, albeit technically not from the Defendants' standpoint.

Even if a forfeiture of the qualified immunity defense occurred, the deficiency of Roper's counsel may be overlooked to prevent "manifest injustice." *McCardle,* 131 F.3d at 52. It is manifestly unjust to require a police officer to pay $10,000 in punitive damages for making an arrest for which probable cause very likely existed and a winning defense of qualified immunity certainly existed, just because his lawyer argued only that probable cause existed and omitted the closely related point that the officer could reasonably believe that probable cause existed. The injustice is especially compelling because the trial judge made it sufficiently clear that counsel's more precise articulation of his position would have been futile.

The injustice of enforcing a forfeiture of Roper's defense in the absence of any prejudice to the Plaintiff is manifest if one considers only Roper's case. But the injustice is exacerbated by comparison of his situation with that of his supervisor, Lt. Sorrentino. Both Roper and Lt. Sorrentino saw and heard exactly the same conduct by Provost. Sorrentino was not merely "present in the police headquarters," 262 F.3d at 155, as the majority recounts; he was in the same position as Roper to see and hear all of Provost's conduct. Sorrentino told Roper to "handle the problem." Roper tried to calm Provost down and, when that effort failed, arrested him for disorderly conduct, with Sorrentino standing immediately behind Provost, obviously observing and condoning the arrest. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994); *see O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). "An officer who fails to intercede is liable for preventable harm caused by the actions of the other officers where

the probable cause issue should suffice to preserve a qualified immunity defense, at least in the absence of any indication that the

Plaintiff would have presented evidence to defeat the immunity claim that was not presented on the probable cause issue.

that officer observes or has reason to know: ... that a citizen has been unjustifiably arrested." *Anderson*, 17 F.3d at 557.

I would extend Sorrentino the same qualified immunity defense that I believe Roper should have, but if Sorrentino is to be exonerated, as the majority rules, not because of qualified immunity (which the majority deems forfeited) but because he is deemed not to have any liability for the arrest, then the injustice to Roper is heightened. The lieutenant who ordered his subordinate to "handle the problem" that both had seen and heard and then stood by while the subordinate "handled" the matter by making a disorderly conduct arrest is exonerated from liability while the subordinate is required to pay $10,000 in punitive damages because his lawyer failed to argue that there were no factual issues on the qualified immunity defense after hearing the trial judge say he thought there were such issues. If that is not a "manifest injustice," I am not sure what the phrase means.

Ultimately this police officer is being punished for just one thing—his lawyer's mistake. In the circumstances of this case, that is an entirely unjustified outcome, one that elevates legal formalism above basic fairness. Since I cannot persuade the majority to rule in Roper's favor, I can only hope that if his employer does not reimburse him, his lawyer will do so, thereby sparing the courts a suit for legal malpractice. I respectfully dissent as to Defendant Roper.