Kenneth MURVIN

v.

William JENNINGS, Gerald Pinto, Orlando Soto, John Therina, Thomas Rodia, Sergeant Supple, and the Town of Stratford

No. CIV. 3:00CV2222(AHN).

United States District Court, D. Connecticut.

March 31, 2003.

Burton M. Weinstein, Weinstein, Weiner, Ignal, Vogel & Shapiro, Bridgeport, CT, for Plaintiff.

Thomas M. Murtha, Mark A. Perkins, Maher & Murtha, Bridgeport, CT, Douglas John Varga, Zeldes, Needle & Cooper, Bridgeport, CT, S. Dave Vatti, Shelton, CT, for Defendant.

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

NEVAS, District Judge.

The plaintiff, Kenneth Murvin ("Murvin"), brings this action alleging violations of 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, Article 1, Sec. 7, 9 and 10 of the Connecticut Constitution, and state common law against the Town of Stratford ("Town"), and officers William Jennings ("Jennings"), Gerald Pinto ("Pinto"), Orlando Soto ("Soto"), John Therina ("Therina"), Thomas Rodia ("Rodia"), Jerome Supple ("Supple") of the Stratford police department. All of the defendants have filed motions for summary judgment.

For the reasons set forth below, summary judgment is GRANTED as to Soto, Therina, Supple, and Rodia [doc. # 71]. Summary Judgment is DENIED as to the Town [doc. # 59], Jennings [doc. # 80], and Pinto [doc. # 77].

### FACTS

Based on the record before the court, the following facts are undisputed. On or about February 8, 1999, Officer Clements of the Stratford Police Department responded to a complaint from Mary Vogt ("Vogt") whose purse had been stolen in the parking lot of the Stop & Shop supermarket in Stratford, Connecticut. Vogt was unable to identify the assailant, but told Officer Clements that the assailant drove a red car. Officer Clements obtained a general description of the robber from another witness to the crime. That witness identified the assailant as a black male, approximately six feet tall, wearing a hat, a winter jacket and loose clothing. The case was referred to Detective Jennings for follow-up investigation.

On or about February 14, 1999, the Milford Police Department responded to a complaint from Karen Masek ("Masek") whose purse had been stolen in the parking lot of the Shop Rite supermarket in

Milford, Connecticut. Masek provided the Milford Police with a general description of the robber. She was also able to describe the car and provide a license plate number. The Milford Police determined that the car was a red 1993 Nissan Altima and was registered to Karen Snead ("Snead"), who resided in Stratford, Connecticut.

A joint investigation by the Milford and Stratford police departments of the vehicle registration address led them to investigate Brian Weaver ("Weaver"), Snead's boyfriend. Weaver was found in possession of the car. The purse belonging to Masek was found inside the car.

On February 15, 1999, Weaver provided a written statement to the Milford police stating that Snead was his girlfriend and that she owned the Nissan. Weaver stated that Snead had gone to visit her family in South Carolina and that he was using her car. Weaver also stated that on February 14, 1999, Murvin borrowed the Nissan during the time the robbery had taken place. Weaver also stated that he was not aware that the car had been used in a robbery in Milford, and that he had no knowledge pertaining to the purse found in the vehicle by Milford police. Weaver described Murvin as a black male, approximately six feet tall with medium build. Weaver informed the police that Murvin lived in the Pequonnock apartments in Bridgeport.

On February 15, 1999, Weaver also gave a written statement to Detective Jennings of the Stratford Police regarding the incident at the Stratford Stop & Shop on February 8, 1999. In that statement, Weaver said that he drove with Murvin to the Stratford Stop & Shop for the purpose of stealing someone's purse. Weaver said that he drove the red Nissan Altima, that Murvin jumped out of the passenger-side seat with a knife, and stole a woman's

purse in the Stop & Shop parking lot. Weaver's February 15, 1999, statement was notarized by Lieutenant Rodia, and witnessed by Sergeant Supple. Weaver's statement was the only evidence that implicated Murvin in the Stratford robbery.

Between February 15 and 17, 1999, Milford police visited Murvin's mother and learned that Murvin had been residing in Florida for the past two years. The officers obtained Murvin's contact information in Florida. The Milford police also conducted a check at the Pequonnock Apartment complex. The resident list of the apartment building did not show that Murvin lived there. Further, no one at the apartment complex to whom the Milford police spoke knew Murvin. The Milford Police also learned from Snead, Weaver's girlfriend, that Murvin had moved out of the Pequonnock apartment building. Snead also told them that she had not seen Murvin for two years.

On or about February 19, 1999, Sergeant Dooling of the Milford Police called Florida and spoke to an individual who identified himself as Murvin. The Milford police learned that Murvin had been with a woman named Dolores Foggy from Saturday, February 13, 1999, through Monday, February 15, 1999. Based on their investigation, the Milford police concluded that Murvin was in Florida at the time the robbery occurred.

During the time the Milford police were conducting their investigation, the Stratford police conducted their own independent investigation. Detective Jennings, accompanied by Sergeant Soto, went to the Pequonnock apartments to determine if Murvin lived there. They obtained no information. Detective Jennings also checked DMV records. Those records did not show that Murvin resided in Connecticut. Detective Jennings also spoke to someone at the Bridgeport Police Depart-

ment who said the name "Murvin" was familiar and that he thought he had recently had some involvement with him. Based on what he learned from his investigation, on February 17, 1999, Detective Jennings applied for an arrest warrant for Murvin. The warrant application was subscribed and sworn by Detective Jennings before Lieutenant Rodia. A warrant to arrest Murvin was presented by the prosecutor to Superior Court Judge G. Sarsfield Ford. The arrest warrant for Murvin was issued on February 17, 1999.

Six days after the arrest warrant was issued, on February 23, 1999, Weaver gave a second written statement to Detective Jennings. In that statement, Weaver stated that, although he had been truthful about his own involvement in the Stratford Stop & Shop robbery on February 8, 1999, he had lied to police about the identity of the other person who had been with him at the time of the incident. Weaver now stated that Murvin had not been with him during the robbery, and that the person who had been with him was a man named Eric, a drug dealer, who resided at P.T. Barnum, a public housing project in Bridgeport. This statement was notarized by Stratford Patrol Sergeant Soto. Detective Jennings included the substance of Weaver's statement on pages six and seven of his eight-page incident report narrative supplement. Detective Jennings placed a copy of Weaver's February 23, 1999, statement recanting his assertion that Murvin was involved in the robbery in Court Liaison Officer Therina's outgoing "court bin" for delivery and inclusion in Weaver's file. Weaver's statement exonerating Murvin was placed in Weaver's file, but it was never put in Murvin's file. At some point, the incident report narrative supplement was put in Murvin's file, but without pages six, seven and eight.

Weaver was arrested by Stratford Police on February 23, 1999, and charged with the February 8, 1999 robbery.

On March 4, 1999, Detective Pinto and Detective Jennings met with Detective Donaldson of the Connecticut Violent Crimes Fugitive Task Force. Detective Donaldson informed Detectives Pinto and Jennings that the Fugitive Task Force was planning to extradite Murvin from Florida, and requested their assistance in obtaining Murvin's location in Florida. Neither Detective Jennings nor Detective Pinto informed Detective Donaldson of Weaver's February 23, 1999, statement absolving Murvin from any involvement in the crimes. Thereafter, Detectives Pinto and Jennings drove to the Milford Police Department and confirmed Murvin's Tampa, Florida address.

Detective Jennings claims that he had no further involvement in the Murvin matter after March 1999. However, the incident report narrative supplement that was in Murvin's file in the State's Attorney's Office, states that "[i]n March, 1999, Detective Jennings learned that Kenneth Murvin may have fled the State of Connecticut to avoid prosecution. Detective Jennings learned that Kenneth Murvin may be 'hiding out' in the Tampa, Florida area."

On October 29, 1999, almost eight months later, FBI Special Agent Randy Jarvis ("Jarvis") of the Violent Crimes Fugitive Task Force applied for an Unlawful Flight to Avoid Prosecution (UFAP) warrant. The warrant was signed by United States Magistrate Judge Joan G. Margolis. Detective Jennings asserts that the FBI's file contained his incident report narrative supplement that mentions Weaver's February 23, 1999, recantation. The fact that Weaver recanted his accusation that Mur-

vin was his accomplice was not, however, mentioned in the UFAP affidavit.[1]

The incident report narrative supplement states that on October 29, 1999, a federal arrest warrant was issued for Murvin's arrest. This report further states that on November 30, 1999, Murvin was arrested by the FBI Fugitive Task Force in Tampa, Florida. Murvin was held in state custody until January 26, 2000. He was charged with robbery in the first degree, conspiracy to commit robbery in the first degree and larceny in the sixth degree. Murvin was subsequently extradited to Connecticut on February 14, 2000.

Murvin was held in custody from February 14, 2000, to April 6, 2000, when he appeared before Superior Court Judge George N. Thim in the Connecticut Superior Court for the Judicial District of Fairfield at Bridgeport. On April 6, 2000, the case against Murvin was dismissed. During the proceedings on April 6, 2000, Assistant Public Defender Jonathan Demirjian represented that at the time of the Stop & Shop robbery in Stratford on February 8, 1999, Murvin had worked an eight-hour day at a job in Florida, and that two days later he took a three-day cruise to the Bahamas. At no time up to and including the time that the charges against Murvin were dismissed was Murvin's attorney given a copy of Weaver's February 23, 1999, statement recanting his accusation that Murvin was involved in the Stratford Stop & Shop robbery. The prosecutor gave Demirjian a copy of the incident report narrative supplement, but the copy did not contain pages six, seven and eight. Weav-

er's statement exculpating Murvin was also never disclosed to the prosecutor.

## STANDARD

A Rule 56 motion for summary judgment may be granted if the court determines that the moving party is entitled to judgment as a matter of law because there are no genuine issues of material fact to be tried. *See* Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995). After discovery, if the party against whom summary judgment is sought "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883–85, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a Rule 56 motion, the court's responsibility is not to resolve disputed issues of fact but rather to assess whether there are, or are not, any factual issues to be tried, while resolving all ambiguities and drawing all reasonable inferences against the moving party. *See Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243,

---

**1.** The UFAP affidavit states, *inter alia*, "[o]n February 15, 1999, Detective Jennings of the Stratford Police Department interviewed Brian Weaver ... who stated that he and Kenneth Murvin did rob the woman at the Stop & Shop in Stratford, Connecticut after planning the robbery several days before." The affida-

vit also states "I have been advised by Detective Jerry Pinto, a member of the Stratford Police Department, that Kenneth Murvin fled Connecticut after February 8, 1999 and is currently residing in the State of Florida with his brother."

249 (2d Cir.1985)); *see also Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). The substantive law governing a particular case identifies those facts that are material with respect to a motion for summary judgment. *See Anderson,* 477 U.S. at 258, 106 S.Ct. 2505. A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact .... " *Miner v. Glens Falls,* 999 F.2d 655, 661 (2d Cir.1993) (citation omitted); *see also Gray v. Town of Darien,* 927 F.2d 69, 74 (2d Cir.1991).

"A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991); *see also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992). Utilizing this standard, each of the four motions for summary judgment motions is discussed in turn below.

## DISCUSSION

The Town moves for summary judgment on the grounds that there is no basis under *Monell v. Department of Soc. Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) for the imposition of municipal liability. Each of the Stratford police officers seek summary judgment on the grounds that either he was not personally involved in the alleged constitutional violations, or his actions are protected by the doctrine of qualified immunity.

### A. Liability of the Municipality

The Town maintains that as a matter of law it can not be held liable for any deprivation of Murvin's constitutional rights because it has no official policy, custom, or practice that encourages or authorizes the violation of the constitutional rights of criminal suspects or the withholding of exculpatory information from prosecuting authorities. It also asserts that it does not have a policy, custom or practice that specifies the exact method by which exculpatory material should be transmitted to prosecutorial authorities. The Town further asserts that it cannot be held liable because all of its police officers receive training, continuing education and refresher courses dealing with legal and constitutional issues and police ethics. In opposition, Murvin contends that the Town is liable for its police officers' failure to insure that the exculpatory information pertaining to the charges against him was actually transmitted to the prosecuting authority. Murvin claims that the Town's liability can be based on its failure to have an official policy that insures that exculpatory material is properly transmitted to prosecuting authorities as required by state statute. The court agrees.

It is well established that municipalities in § 1983 actions are not subject to either respondeat superior or vicarious liability claims. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Monell v. Department of Soc. Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality may only be liable "under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a

policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 689, 98 S.Ct. 2018. However, the requirements for municipal liability under *Monell* do "not mean that the plaintiff must show that the municipality had an explicitly stated rule or regulation." *Powell v. Gardner*, 891 F.2d 1039, 1045 (2d Cir.1989). Indeed, the Second Circuit has clearly held that liability need not be based on an explicitly stated rule or regulation—liability may be premised on municipal inaction or omissions. *See, e.g., Villante v. Department of Corr.*, 786 F.2d 516, 519 (2d Cir.1986); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983); *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir.1980) ("We see no reason why an official policy cannot be inferred from the omissions of a municipality's supervisory officials, as well as from its acts"); *accord Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir.1986) (holding that a municipality may be subjected to § 1983 liability on the basis that it tolerates unconstitutional acts by its employees). To support a *Monell* claim based on inaction, a plaintiff must demonstrate that the municipality's failure to act is so severe that it constitutes "deliberate indifference" to a plaintiff's rights. *See City of Canton v. Harris*, 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The phrase "deliberate indifference" means more than "simple or even heightened negligence"; it involves a "conscious disregard" on the part of municipal employers for the consequences of their actions. *See Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. *See Canton*, 489 U.S. at 390, 109 S.Ct. 1197; *Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir.1995).

■ Here, the Town cannot avoid liability as a matter of law merely because it does not have a policy, custom or practice that governs the transmittal of exculpatory material to prosecuting officials. To the contrary, as the foregoing case law clearly establishes, the Town may be liable under § 1983 for its failure to take action to insure that the constitutional rights of criminal suspects are not violated and that its police officers abide by the statutorily-imposed duty to disclose exculpatory information to prosecuting authorities. *See* Conn. Gen.Stat. § 54–86c(c).

With respect to the statutorily-imposed duty to disclose exculpatory information to prosecuting authorities, the relevant statute provides that:

> Each peace officer, shall disclose in writing any exculpatory information or material which he may have with respect to any criminal investigation to the prosecutorial official in charge of such case.

*Id.*

■ At oral argument the Town admitted that in lieu of a policy or practice implementing this statute, it relies on the good judgment of its police officers to ensure that the State's Attorney is notified of any exculpatory evidence it has with respect to criminal investigations. This admission, however, is contrary to Detective Jennings's statement at oral argument that the Stratford Police Department had a procedure for transmitting such exculpatory information to the State's Attorney—the information is put in a "court bin" for delivery. This contradiction alone creates a factual issue for trial as to the existence or non-existence of a policy or procedure. Moreover, a jury must decide whether the procedure, or lack of procedure, constitutes conscious disregard or deliberate indifference to the constitutional and statutory rights of

criminal suspects. There is also a factual issue as to whether the general training of police officers was sufficient to insure that the police officers followed the requirements of the state statute or whether it was sufficient to rely on their good judgment to insure that the rights of criminal suspects were protected. For these reasons, the Town's motion for summary judgment is denied.

### B. *Liability of Detective Jennings*

Detective Jennings moves for summary judgment on his affirmative defense of qualified immunity. He asserts that his conduct did not violate any clearly established constitutional rights because he followed the procedure in place for notifying the State's Attorney's Office of exculpatory information.

 As a general rule, police officials are entitled to qualified immunity, and are not subject to personal liability for civil damages, if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) [2] (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"); *Hayter v. City of Mount Vernon,* 154 F.3d 269, 274 (5th Cir.1998) (employing a two-step analysis for determining whether police are entitled to qualified immunity: whether plaintiff alleged viola-

tion of a clearly established constitutional right and whether conduct of police was objectively reasonable). Qualified immunity protects government officials performing their duties from the burdens of trial and the threat of monetary liability. *See Harlow,* 457 U.S. at 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Without such an immunity, the operations of government would be immobilized." *Torchinsky v. Siwinski,* 942 F.2d 257, 260 (4th Cir.1991). Thus, a government official surrenders this immunity only where a reasonable official would have known that the action violated clearly established constitutional rights. *See Harlow,* 457 U.S. at 818, 102 S.Ct. 2727.

 To determine whether Detective Jennings's actions are insulated from liability under the doctrine of qualified immunity, the relevant inquiry is objective and fact-specific: Was it objectively reasonable for Detective Jennings to believe that his acts did not violate any clearly established constitutional or statutory right? *See Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). Detective Jennings's subjective belief about the lawfulness of his actions are simply "irrelevant." *See Anderson,* 483 U.S. at 641, 107 S.Ct. 3034.

Here, there is no dispute that Murvin has a constitutional right to be free from malicious prosecution, false imprisonment, and false arrest. He also has a right conferred by a state statute that requires police officers to disclose in writing to the prosecutorial official in charge of his case

---

**2.** Prior to *Harlow,* the standard for qualified immunity embraced both an objective and a subjective inquiry. *See Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). However, the subjective element of the standard proved "disruptive of effective government" and incompatible with the goal

of "[resolving] many insubstantial claims through summary judgment." *Harlow,* 457 U.S. at 817, 102 S.Ct. 2727. Accordingly, the subjective element was abandoned in favor of purely objective criteria. *Id.* at 818, 102 S.Ct. 2727.

any exculpatory information or material. The issue that must be decided is whether it was objectively reasonable for Detective Jennings to believe that the steps he took to disclose the exculpatory information about Murvin to the prosecutorial official in charge of his case were sufficient to meet the obligations imposed by state statute and the constitution.

 This issue cannot be decided on the basis of the evidence before the court. That evidence shows that Detective Jennings provided the Court and the prosecutor with Weaver's February 15, 1999, statement implicating Murvin as Weaver's accomplice and that Weaver's statement provided probable cause to support the issuance of an arrest warrant for Murvin. The evidence also establishes that eight days later, Weaver informed Detective Jennings, in a sworn statement, that he lied about Murvin's involvement in the robbery, and stated that Murvin did not participate in that robbery in any way. After Weaver gave the statement exonerating Murvin, there was no longer probable cause for Murvin's arrest. Although the evidence shows that Detective Jennings put Weaver's February 23, 1999, statement and his incident report narrative supplement containing the substance of Weaver's exculpatory information on pages six and seven in the "court bin" for inclusion in Weaver's file, there is no evidence that he did anything to insure that the exculpatory information was actually disclosed to the prosecuting attorney responsible for Murvin's case or was included in Murvin's file. Indeed, the evidence shows that the State's Attorney's file on Murvin did not contain a copy of Weaver's exculpatory statement, and its copy of Detective Jennings's narrative supplement was missing pages six, seven and eight. Further, the evidence shows that when Detective Jennings was questioned by the Fugitive Task Force about Murvin's whereabouts in March 1999, he did not mention that Weaver had exonerated Murvin by recanting his initial statement accusing Murvin of participating in the robbery. Detective Jennings also did not question the Fugitive Task Force as to why they were pursuing Murvin's arrest and extradition in light of Weaver's second statement and the information he had learned from the Milford police that Murvin was residing in Florida at the time of the robberies.

In sum, this record evidence presents a factual issue as to whether Detective Jennings's actions after Weaver gave the exculpatory statement were consistent with what a reasonable police officer would have done under the circumstances, or whether they constitute deliberate indifference or reckless disregard of Murvin's rights. Accordingly, Detective Jennings's motion for summary judgment on the grounds of qualified immunity is denied.

In addition, because there are disputed factual issues as to Detective Jennings's actions, his motion for summary judgment on the state law claims of negligence and intentional infliction of emotional distress is also denied.

C. *Liability of Detective Pinto*

Detective Pinto claims that he cannot be held liable for Murvin's arrest because he had no personal involvement in the alleged constitutional deprivation and is thus entitled to qualified immunity. In response, Murvin argues that Detective Pinto was personally involved because he knew or should have known about Weaver's February 23, 1999, statement exculpating Murvin and that there is an issue of material fact as to whether Detective Pinto's participation in the alleged illegal action constituted "deliberate indifference."

 Generally, defendants may only be held liable for damages under

§ 1983 when they have "personal involvement in the alleged constitutional deprivations." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986). "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir.1991)). A defendant in a § 1983 action cannot be held liable "merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996).

The Second Circuit has construed "personal involvement" as meaning "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Id.* at 74 (citation omitted). Personal involvement includes direct participation, but only if the defendant was aware or had notice of the facts that rendered the action illegal. *See Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir.2001). In other words, innocent participation is not sufficient for § 1983 liability. *See id.* Rather, "direct participation as a basis of liability . . . requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Id.*

■■■ Based on the record evidence, the court finds that there are disputed factual issues surrounding Detective Pinto's knowledge, involvement, and conduct and thus agrees that summary judgment is not appropriate. Detective Pinto asserts that he had no involvement in the investigation of the case against Murvin and claims that he never read Weaver's second statement and has no recollection of being informed of its contents. In contrast, Detective Jennings states in interrogatory responses

that he verbally notified Detective Pinto of Weaver's February 23, 1999, statement because Detective Pinto was "was working the case with me." Detective Pinto further contends that his involvement in the case was limited to driving with Detective Jennings to a meeting with the Milford police on March 4, 1999, but that he did not participate in the meeting and was not informed of the content of the discussions between Detective Jennings and the Milford police. Detective Pinto also claims that he was with Detective Jennings when he met with Detective Donaldson of the Fugitive Task Force, but that he does not recall participating in the discussions between Detective Jennings and Detective Donaldson. Detective Pinto also says that in May 1999, he was assigned to the Connecticut Violent Crimes Fugitive Task Force and that as a member of the Task Force he knew that it was interested in outstanding warrants involving felonies, use of a weapon, and flight to avoid prosecution. Thus, he decided that the Task Force would be interested in the outstanding warrant for Murvin and accordingly notified the Task Force of its existence. He provided the Task Force with a copy of the warrant, copies of the incident reports and information about Murvin's location. Thus, there is no dispute that as a member of the Task Force, Detective Pinto had access to Detective Jennings's incident report narrative supplement containing the exculpatory information about Murvin's involvement in the robbery, but he nonetheless notified the Task Force of the outstanding warrant so that it could proceed with Murvin's arrest.

This evidence demonstrates the existence of a factual issue as to whether Detective Pinto knew about Weaver's statement exonerating Murvin, the extent of his involvement in the investigation and arrest, and whether his actions in aiding

law enforcement officials to arrest Murvin in Florida constituted "deliberate indifference" or "gross negligence."

### D. Liability of Officers Rodia, Soto, Therina & Supple

Officers Rodia, Soto, Therina, and Supple have also moved for summary judgment on the basis of qualified immunity on the grounds that they had no personal involvement in the investigation or the alleged constitutional deprivations. See Wright, 21 F.3d at 501. The court agrees that the undisputed facts show that they had no knowledge or notice of the facts that rendered the alleged acts illegal and did not intentionally participate in the conduct constituting an alleged violation of Murvin's rights. See Provost, 262 F.3d at 155.

■ The uncontroverted evidence establishes that Lieutenant Rodia's involvement in this case was limited to notarizing Weaver's written statement on February 15, 1999, and notarizing Detective Jennings's arrest warrant application for Murvin on February 17, 1999. While Lieutenant Rodia states that during the course of casual conversation he learned that Weaver recanted his original statement, the evidence establishes that he also learned that Detective Jennings had disclosed Weaver's recantation to the court and prosecutor. Based on these facts, the court finds that no reasonable jury could find that Lieutenant Rodia was personally involved in the alleged constitutional violations. See Provost, 262 F.3d at 156 (finding supervising lieutenant entitled to qualified immunity where there was insufficient evidence that he had knowledge of the activities of the arresting officer and participated in them); see also Black v. Coughlin, 76 F.3d at 74 (noting that a defendant in a § 1983 action can not be held liable merely because he held a position of authority).

The same is true with regard to the facts pertaining to the claims against Sergeant Supple. The undisputed facts pertaining to his involvement show that Sergeant Supple's only involvement was to witness Weaver's February 15, 1999, statement to Detective Jennings. This is insufficient to find that he was personally involved in the alleged constitutional violations.

Likewise, Court Liaison Officer Therina's involvement is limited to picking up the information that Detective Jennings put in the "court bin" and delivering it. There is no allegation or evidence that Officer Therina participated in or had an knowledge of Weaver's recantation, spoke to Detective Jennings about Weaver's statements, or read either of the statements. There is also no evidence that he participated in any part of the investigation. Officer Therina's knowledge and degree of involvement are insufficient as a matter of law to hold him personally liable in this case.

Finally, there is an insufficient factual basis to support a finding that Sergeant Soto was personally involved in the alleged constitutional violations. His only involvement consisted of notarizing the signature on Weaver's February 23, 1999, and in accompanying Detective Jennings to the Pequonnock apartment complex for information about Murvin.

Because the facts, even viewing them most favorably to the plaintiff, would not permit a reasonable jury to find that these officers were personally involved in the alleged deprivation of Murvin's rights, summary judgment is appropriate as to the § 1983 claim against them. In addition, any pendent state law claims against them are dismissed for lack of jurisdiction.

### CONCLUSION

For the foregoing reasons, the Town's motion for summary judgment [doc. # 59],

Detective Jennings's motion [doc. # 80] and Detective Pinto's motion [doc. # 77] are all DENIED. The motion of Officers Soto, Therina, Supple and Rodia [doc. # 71] is GRANTED.