Rupp v. City of Buffalo

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2021

(Argued:  May 16, 2022                    Decided:  January 31, 2024)

Docket No. 21-1036

_____

R. ANTHONY RUPP, III,

*Plaintiff-Appellant*,

- v. -

CITY OF BUFFALO, DANIEL DARENDA[*], individually and in his capacity as Police Commissioner of the Buffalo Police Department, TODD C. MCALISTER, individually and in his capacity as a Buffalo Police Officer, NICHOLAS PARISI, individually and in his capacity as a Buffalo Police Officer, and JEFFREY GIALLELLA, individually and in his capacity as a Buffalo Police Lieutenant,

---

[*]    Although this defendant spells his name "Derenda," the caption on the operative complaint spells it "Darenda," and we thus use the spelling "Darenda" here and throughout this opinion, except in quotations in which it is spelled "Derenda."  *See generally Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 555 n.* (1980).

*Defendants-Appellees*[**].

_____

Before: KEARSE, CARNEY, and LEE, *Circuit Judges*.

Appeal by plaintiff from so much of a judgment of the United States District Court for the Western District of New York, William M. Skretny, *Judge*, as dismissed his complaint against defendants City of Buffalo and/or certain members of its police department principally for malicious prosecution, First Amendment retaliation, and false arrest on a charge of noise-ordinance violation for crudely shouting to a policeman--who was driving on a city street in the dark without headlights both before and after having to stop short of hitting two crossing pedestrians--to turn on his headlights. The district court granted summary judgment in favor of defendants, holding principally that plaintiff's shout was not protected by the First Amendment because he did not know he was addressing a police officer, and that all of his claims were barred by the existence of probable cause--or at least arguable probable cause sufficient to give the officers qualified immunity--for plaintiff's arrest. *See Rupp v. City of Buffalo*, 2021 WL 1169182, at *8, *11-*12 (W.D.N.Y. Mar. 29, 2021). Plaintiff challenges those rulings, arguing principally that the court

[**] The Clerk of Court is instructed to amend the official caption to conform with the above.

erred in concluding that he was required to show an intent to criticize a police officer in order for his speech to be protected under the First Amendment, and in ruling that there was probable cause to believe that his shout constituted noise that was unreasonable under the City's noise ordinance; he also contends that, on the undisputed facts, summary judgment should have been entered in his favor on his principal claims against the officer who operated the unlit vehicle.

We conclude that with the record viewed in the light most favorable to the side opposing summary judgment, neither movant was entitled to summary judgment on the above claims, as there were genuine issues of fact concerning the existence of probable cause; that the district court erred in granting summary judgment to defendants on those claims by resolving fact issues in their favor; and that the court erred in ruling, on the present record, that plaintiff's speech was not subject to First Amendment protection. To the extent that plaintiff also claimed that the City's noise ordinance was unconstitutional as applied to him, we conclude that that claim was properly dismissed because, as plaintiff was found not to have violated the ordinance, it was not in fact applied to him. Any cognizable aspect of this claim was essentially duplicative of his claims of false arrest, malicious prosecution, or First Amendment retaliation, which we reinstate.

Affirmed in part, vacated in part, and remanded.

CHAD DAVENPORT, Buffalo, New York (Marco Cercone, Rupp Baase Pfalzgraf Cunningham, Buffalo, New York, on the brief), *for Plaintiff-Appellant*.

DAVID M. LEE, Assistant Corporation Counsel, Buffalo, New York (Timothy A. Ball, Corporation Counsel of the City of Buffalo, Buffalo, New York, on the brief), *for Defendants-Appellees*.

KEARSE, *Circuit Judge*:

Plaintiff R. Anthony Rupp, III, appeals from so much of a judgment of the United States District Court for the Western District of New York, William M. Skretny, *Judge*, as dismissed his complaint against defendants City of Buffalo ("City" or "Buffalo") and/or certain members of its police department principally for malicious prosecution, First Amendment retaliation, and false arrest on a charge of unreasonable noise in violation of the Buffalo City Code noise ordinance (or "City Code") for crudely shouting to a policeman--who was driving on a city street in the dark without headlights both before and after having to stop short of hitting two

- 4 -

crossing pedestrians--to turn on his headlights. The district court granted summary judgment in favor of defendants, ruling principally that plaintiff's shout was not protected by the First Amendment because he did not know he was addressing a police officer, and that all of his claims were barred by the existence of probable cause--or at least arguable probable cause sufficient to give the officers qualified immunity--for his arrest. Rupp challenges those rulings, arguing principally that the court erred in concluding that he was required to know that he was criticizing a police officer in order for his speech to be protected under the First Amendment, and in ruling that there was probable cause to believe his shout constituted noise that was unreasonable under the Buffalo noise ordinance; he also contends that, on the undisputed facts, summary judgment should have been entered in his favor on his principal claims against the officer who operated the unlit vehicle.

For the reasons that follow, we conclude that, with the record viewed in the light most favorable to the side opposing summary judgment, neither moving side was entitled to summary judgment, as there were genuine issues of fact concerning the reasonableness of Rupp's shout; that the district court erred in granting summary judgment to defendants by resolving fact issues in their favor; and that the court erred in ruling, on the present record, that plaintiff's speech was not

subject to First Amendment protection. To the extent that Rupp also complained that the City's noise ordinance was unconstitutional as applied to him, we conclude that that claim was properly dismissed because, as he was found not to have violated the ordinance, the ordinance was not in fact applied to him. Any cognizable aspect of this claim was essentially duplicative of his claims of false arrest, malicious prosecution, or First Amendment retaliation, which we reinstate.

## I. BACKGROUND

Rupp is an attorney residing in or near Buffalo. The principal individual defendants are Todd C. McAlister and Nicholas Parisi, who at the relevant time, were officers of the Buffalo Police Department ("BPD"), and Jeffrey Giallella, a BPD lieutenant. The case concerns a December 2016 encounter between Rupp and McAlister in Buffalo that ended in the issuance of a noise-ordinance-violation summons to Rupp.

A. *The Events*

Most, but not all, of the relevant facts are not in dispute, as gleaned principally from the parties' respective admissions or undisputed assertions as to material facts on the motions for summary judgment ("Undisputed Local Rule 56(a) Statements" (or "Undisputed ¶")).

1. *The Undisputed Facts*

At approximately 8:30 p.m. on December 1, 2016, Rupp and his wife, near 291 Seneca Street, after leaving Chef's Restaurant, began to cross the street to get to Chef's parking lot. (Undisputed ¶ 1.) "As the couple crossed to the middle of the street, plaintiff noticed a vehicle approaching without its headlights on." (Defendants' brief on appeal at 1 (internal appendix citations omitted).) "McAlister . . . was driving the vehicle on Seneca Street towards Rupp and his wife in the dark with no headlights activated or running lights illuminated." (Undisputed ¶ 4.) Rupp and his wife quickly made their way across the street. (*See* Defendants' brief on appeal at 2.)

After Rupp and his wife safely crossed, "two women began to cross the street and stepped directly into the path of the police vehicle" (Defendants' brief on appeal at 2 (internal appendix citations omitted)). McAlister stopped without hitting

the women (*see id*.)--although as described in Part I.A.2. below, there may be different views as to how close he came. McAlister "stopped and flashed his headlights as a signal to the women that they could safely cross." (*Id*.; Undisputed ¶ 7.) And "[a]fter the women safely crossed, *the vehicle's lights then went dark again as McAlister proceeded*." (Defendants' brief on appeal at 2 (internal appendix citations omitted (emphasis added)); *see* Affidavit of R. Anthony Rupp III dated February 28, 2019 ("Rupp Aff."), ¶ 6 (after "the operator of the vehicle . . . flashed either his headlights or high-beams at the pedestrians" he "then turned the car lights back off.").)

After McAlister had avoided hitting the pedestrians, Rupp called out "turn your lights on, asshole." (Undisputed ¶ 8.)

Upon hearing Rupp's shout, McAlister immediately pulled into the Chef's parking lot where Rupp and his wife were walking to their car. (Undisputed ¶ 10.) Rupp then, "for the first time, . . . realized" that the "vehicle was a Buffalo Police Department" vehicle. (Rupp Aff. ¶ 10.) McAlister "rolled down the front passenger window, leaned across the console, and said, 'You know you can be arrested for that.'" (*Id*. ¶ 11; *see* Undisputed ¶ 11.)

Rupp, in response, told McAlister that he should not be driving down a city street after dark without his headlights activated; he "reminded defendant

- 8 -

McAlister that [McAlister] had almost cause[d] a pedestrian accident." (Undisputed ¶ 12.) McAlister then "got out of his vehicle and told Rupp he was detained." (Undisputed ¶ 13.)

When McAlister asked Rupp for identification, Rupp provided his government-issued attorney identification card which bore his photograph. McAlister then demanded Rupp's driver's license, which Rupp eventually provided, following a repeated request and the arrival of Officer Parisi. (*See* Undisputed ¶¶ 14, 20-21.) Eventually Lieutenant Giallella also arrived. (*See* Undisputed ¶ 22.)

After Parisi arrived, McAlister admitted that he had been driving the vehicle without using headlights. (*See* Undisputed ¶ 17.) Rupp repeatedly argued to McAlister, Parisi, and Giallella, that McAlister had violated the New York Vehicle and Traffic Law ("VTL") by driving at night without headlights. Rupp insisted that McAlister was not exempt from complying with the VTL just because he was a police officer; he asked Parisi and Giallella to cite McAlister for that violation; both refused. (*See, e.g.*, Undisputed ¶¶ 16, 19, 23.)

After McAlister, Parisi, and Giallella conferred privately, Giallella returned Rupp's identification to him and handed Rupp a "citation," signed by McAlister, "for violating the City of Buffalo's noise prohibition, Chapter 293, Sections

4 and 7, of the Buffalo City Code."  (Undisputed ¶¶ 25-26; *see* Complaint Exhibit A ("Citation").)

On the following day, Rupp sent a letter to BPD's Commissioner, defendant Daniel Darenda, complaining about the events of the evening of December 1.  Rupp never received a response.  (*See* Undisputed ¶ 27.)  In October 2017, Rupp appeared for a hearing in connection with the Citation; after a full hearing, Rupp was found not guilty of any violation or crime and the charges were dismissed.  (*See* Undisputed ¶¶ 28-29.)

2. *The Principal Factual Dispute*

The principal factual issue was how dangerous the situation was for the two women who began crossing the street in McAlister's path.  The complaint alleged that seconds after Rupp and his wife had safely finished crossing Seneca Street

> two female patrons of Chef's Restaurant walked out of the parking lot across from the restaurant and attempted to cross Seneca Street to go to Chef's.  From Rupp's vantage point, it appeared that the[y] . . . certainly would be hit by the ongoing . . . unilluminated vehicle.

> 30. Defendant McAlister was able to apply his brakes and come to *an abrupt stop* only a few feet away from hitting and killing the two female patrons.

(Complaint ¶¶ 29-30 (emphasis added).) In his affidavit, Rupp estimated that the vehicle had been "able to brake to a stop approximately two feet from the pedestrians." (Rupp Aff. ¶ 6.) His wife estimated that "[t]he vehicle braked to a stop only inches from the pedestrians." (Affidavit of Linda M. Rupp dated February 28, 2019 ("Linda Rupp Aff."), ¶ 4.)

In their answer to the complaint, defendants denied knowledge or information as to most allegations, including that 8:30 p.m. on December 1 was "well after sunset" and that "the street was dark aside from the street lights and nearby illuminated signage" (Complaint and Answer ¶ 26). And in response to the complaint's ¶ 30, defendants stated that they "admit[ted] that [McAlister] did not strike any female patrons" but "den[ied] knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in said paragraph" (Answer ¶ 30)--*i.e.*, apparently unable to know or estimate the distance of the vehicle from the pedestrians when McAlister stopped, or know whether it had "come to an abrupt stop" (or even whether McAlister had "appl[ied] his brakes").

Similarly, in response to Rupp's Material Fact ¶ 6, that McAlister had "abruptly applied his brakes and was able to stop only a few feet away from the two female pedestrians, nearly hitting and killing them," defendants responded only that

they "do not dispute that Defendant McAlister stopped his vehicle but dispute that he nearly hit and killed them" (Undisputed ¶ 6), citing a March 15, 2019 affidavit submitted by McAlister ("McAlister Aff.")--which is described in Part II.B. below. Defendants did not deny that McAlister applied his brakes "abruptly" and "was able to stop only a few feet away from the two female pedestrians." (*Id.*)

B. *The Unabandoned Claims in the Present Action*

Rupp had commenced the present action in November 2017, asserting 13 numbered causes of action. Following motions to dismiss and for summary judgment, the matter was referred to Magistrate Judge Jeremiah J. McCarthy for report and recommendation. To the extent pertinent to this appeal, the magistrate judge found that there were material issues of fact to be tried as to certain of Rupp's claims. *See Rupp v. City of Buffalo*, No. 17-CV-1209S, 2019 WL 12074104, at *8-*9 (W.D.N.Y. Aug. 7, 2019) ("Report and Recommendation"), familiarity with which is assumed. He principally recommended the denial of defendants' motion to dismiss the First Amendment retaliation claim, and the denial of both sides' motions for summary judgment with regard to the claims of false arrest and malicious prosecution based on the existence (as defendants argued) or absence (as Rupp

argued) of probable cause for Rupp's arrest for noise-ordinance violation.  *See id*. at *15.

Both sides objected to some parts of the magistrate judge's Report and Recommendation.  The district court, in a Decision and Order dated March 29, 2021, determined that about half of the claims asserted by Rupp had either been abandoned (for failure to object to the magistrate judge's recommendation for dismissal) or were duplicative of other claims.  *See Rupp v. City of Buffalo*, No. 17-CV-1209S, 2021 WL 1169182, at *6 (W.D.N.Y. Mar. 29, 2021) (or "D.Ct.Op.").  The court concluded that Rupp's unabandoned causes of action were

- claims asserted against McAlister, Parisi, and Giallella for First Amendment retaliation (**Claim 1**), and for false arrest in violation of the Fourth Amendment (**Claim 2**);

- claims against all defendants for false arrest in violation of New York law (**Claim 4**);

- a claim against McAlister for malicious prosecution in violation of New York law (**Claim 5**);

- claims against Parisi and Giallella for failure to intervene to prevent McAlister's violations of Rupp's First and Fourth Amendment rights (**Claim 11**);

- a claim against the City for the surviving state-law torts on a theory of respondeat superior under New York law (**Claim 7**); and

- a claim against the City for First Amendment violation in the application of its noise ordinance (**Claim 9**).

*See id*. at *7-*13.

C. *The District Court's Decision*

In its Decision and Order, the district court disagreed with the report of the magistrate judge to the extent that he recommended denial of defendants' motion to dismiss the above claims. As to the First Amendment retaliation claims, the court found that Rupp's shout to McAlister was not entitled to First Amendment protection and was, in any event, foreclosed by the existence of probable cause for his noise-violation arrest. The court stated, *inter alia*, as follows.

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Hous. v. Hill*, 482 U.S. 451, 461, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987). "Speech directed at police officers will be protected unless it is likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest." *Kerman v. City of New York*, 261 F.3d 229, 242 (2d Cir. 2001).

Relying on this body of law, Rupp argues that he engaged in protected criticism of a police officer when he yelled out at McAlister. But this argument fails to recognize the significance of two key admissions. First, Rupp admits that he did not know that he was yelling at a police officer until well *after* he yelled. He

- 14 -

therefore did not direct or intend his speech as criticism of a police officer. Second, Rupp admits that he yelled out because he was "[u]pset with the driver's reaction and provoked by the fear he had induced in my wife and me." (Rupp Aff., ¶ 7.) Rupp therefore did not intend or express his speech as criticism of police conduct in the moment. To the contrary, the undisputed record demonstrates that Rupp simply yelled at a passing car, after dark, which yell contained an expletive.

D.Ct.Op., 2021 WL 1169182, at *8 (emphasis in original). The court continued:

Now after the fact, Rupp *artfully* attempts to characterize his yell as a protected warning about *dangerous* police *conduct--driving a police vehicle at night without headlights illuminated*--and argues that *he did not have to know that the driver was a police officer for his speech to be protected* as criticism of law enforcement under the First Amendment. (Reply Memorandum, Docket No. 26, p. 3.) But Rupp offers no authority for this proposition, and none of the cases upon which he relies involve speech directed at an individual who, as it later turned out, just happened to be a police officer.

*Id*. (emphases added).

Rather, and not surprisingly, each of the cases Rupp cites involves speakers criticizing individuals *known* to be police officers and targeted for speech *because* they are police officers engaged in police duties. *See*, *e.g.*, *Hill*, 482 U.S. at 453-54, 107 S.Ct. 2502 (speech directed at a uniformed officer engaged in police duties); *Hartman* [*v. Moore*], 547 U.S. [250,] 252-53, 126 S. Ct. 1695[, 1699 (2006)] (speech directed at federal officials); *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (striking down an ordinance criminalizing certain speech directed at police officers); *Smith v. Campbell*, 782 F.3d 93, 96-97 (2d Cir. 2015) (speech directed at known law enforcement officers related to

their police duties); *Posr v. Ct. Officer Shield #207*, 180 F.3d 409, 413 (2d Cir. 1999) (speech directed at uniformed state court security officers engaged in their duties); *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1374-75 (9th Cir. 1990) (speech and conduct directed to a uniformed police officer conducting police duties).

D.Ct.Op., 2021 WL 1169182, at *8 (emphases in original).

Given Rupp's admission that he did not know that he was yelling at a police officer, this Court finds that no reasonable juror could conclude that he engaged in speech protected by the First Amendment *in the form of law enforcement criticism*. Rupp therefore cannot establish the first element of his claim, which itself entitles Defendants to summary judgment.

*Id*. (emphasis added).

The court also found that defendants' actions had not "chilled" Rupp's speech because

[t]he undisputed record also demonstrates that the individual defendants' actions did not actually chill Rupp's speech. To the extent it could be found that Rupp was complaining about police conduct before McAlister detained him, Rupp concedes that he continued to complain about police conduct throughout the encounter with Defendants McAlister, Parisi, and Giallella, and in a letter submitted to Defendant Derenda the next day.

*Id*. However, the court acknowledged that "[c]hilled speech is not the *sine qua non* of a First Amendment claim," and held that "a reasonable jury could find that Rupp

- 16 -

suffered a concrete harm . . . by virtue of having to appear at [a hearing] with counsel on the summons." *Id.* at *9 (internal quotation marks omitted).

Having noted that the existence of probable cause will normally defeat a claim of arrest in retaliation for the exercise of First Amendment rights, *see id.* at *7, the court addressed the record as to the existence or absence of probable cause for Rupp's arrest. The court noted that the magistrate judge had

> found it undisputed that McAlister "nearly hit two pedestrians crossing the street." (Report and Recommendation, p. 11 n. 8.) From there, he found that Rupp's yell "plainly constitute[d] a justified warning." *Id*. *This Court does not share that view of the record*. McAlister states that the pedestrians "abruptly walk[ed] out into the street," and that he stopped for them to cross safely. (McAlister Aff., ¶¶ 4, 5.) The Rupps, on the other hand, maintain that McAlister nearly hit the pedestrians, with Rupp estimating that McAlister stopped two feet in front of them, and Linda stating that he stopped "only inches" from them. (Rupp Aff., ¶ 6; L. Rupp Aff., ¶ 4.) *Notwithstanding this disagreement, it is undisputed that McAlister stopped his vehicle and that the pedestrians crossed safely*.

D.Ct.Op., 2021 WL 1169182, at *10 n.8 (emphases added).

The district court reasoned that there was probable cause, stating as follows:

> In assessing whether probable cause existed for McAlister to detain and cite Rupp for violating this noise ordinance, this Court considers the totality of the following undisputed facts

- 17 -

known to McAlister. First, it was approximately 8:30 p.m. and dark outside. Second, both McAlister and Rupp were in a public, outdoor space near Chef's Restaurant, which was open and operating. Third, McAlister stopped his vehicle in the vicinity of Chef's Restaurant to permit two pedestrians to safely cross Seneca Street. Fourth, that after McAlister began to proceed again, Rupp yelled, "Turn your lights on, asshole," loudly enough to cause McAlister to turn into the parking lot and further investigate. Fifth, that the two pedestrians were also in proximity to hear Rupp's yell.

*Based on these undisputed facts, this Court concludes as a matter of law that McAlister had probable cause to detain and cite Rupp for violating the noise ordinance.* Rupp yelled loudly at night in a public place--*loudly enough for McAlister to hear him in his running vehicle as he proceeded down the street*--in front of a restaurant and at least three unknown individuals, and his yell contained an expletive. Given both the volume and nature of Rupp's yell in the presence of *bystanders*, a reasonable person of normal sensitivities could be annoyed and have their quiet, comfort, and repose disturbed. McAlister therefore had probable cause to detain and cite Rupp for violating the noise ordinance.

D.Ct.Op., 2021 WL 1169182, at *10 (footnote omitted) (emphases added).

The court found that Rupp's argument that "no reasonable person would be annoyed by a yelled" "warning to a police officer engaged in dangerous conduct," was "unpersuasive" for two reasons. *Id*.

First, Rupp's argument hinges on his belief that a loud warning was warranted. But *the salient facts for determining probable cause are those understood by McAlister*, not by Rupp. *See Panetta [v. Crowley]*, 460 F.3d [388,] 395 [(2d Cir. 2006)]. *In that*

- 18 -

*regard, at the time Rupp yelled, McAlister did not perceive any apparent danger or emergency.*

D.Ct.Op., 2021 WL 1169182, at *10 (emphases added).  The court continued:

> There is no evidence that McAlister knew *while he was driving* that his headlights were off, nor did McAlister view the situation with the two pedestrians as dangerous.  (McAlister Aff., ¶¶ 4, 5.) *From McAlister's perspective* the pedestrians stepped in front of him, which *caused him to have to stop to allow them to cross safely.  Id.*  Whether Rupp perceived the situation differently has no bearing on *what McAlister knew at the time he heard Rupp yell* for purposes of determining probable cause.  *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 570 (2d Cir. 1996) ("[P]robable cause for an arrest must be determined on the basis of the information reasonably available to the arresting officer *at the time of the arrest*, not on the basis of what the arrested party believed to be happening.")

D.Ct.Op., 2021 WL 1169182, at *10 ("while he was driving" emphasized in original (other emphases ours)).  The court went on:

> Second, as McAlister assessed this *fluid situation*, he was not required to explore every legitimate reason Rupp may have had for yelling. . . .  Rupp essentially argues that McAlister should have elected not to cite him under the circumstances.  But discretion to charge and probable cause to charge are distinct concepts.  Here, probable cause to believe that Rupp violated the noise ordinance arose the moment McAlister heard Rupp loudly yell a phrase containing an expletive at night in a public place *within earshot of himself and at least two bystanders (the pedestrians)*.  Whether McAlister should thereafter have exercised his discretion differently after learning more about the circumstances of Rupp's yell is a separate matter not at issue.  For probable cause purposes,

McAlister was not required to explore the reason Rupp yelled before detaining him for violating the noise ordinance. . . .

Accordingly, this Court finds that a person of reasonable caution faced with the undisputed facts known to McAlister at the time in question would have sufficient reason to believe that Rupp violated the noise ordinance, such that probable cause to detain and cite Rupp for such a violation existed. . . . Because the existence of probable cause is a complete defense to Rupp's First Amendment retaliation claim, Defendants McAlister, Parisi, and Giallella are entitled to summary judgment.

D.Ct.Op., 2021 WL 1169182, at *11 (emphases added).

Having determined "that probable cause existed as a matter of law, or at a minimum, that arguable probable cause existed," the court concluded that defendants were also entitled to summary judgment dismissing Rupp's false arrest claim, *see id*. at *12, and his malicious prosecution claim, *see id*. at *13. And on the bases of all of the above findings, the court found that the federal claims of failure to intervene and the New York claim of respondeat superior were dismissable for lack of any predicate violations. *See id*.

Judgment was entered dismissing the complaint. This appeal followed.

## II. DISCUSSION

On appeal, Rupp contends principally that the district court erred in ruling that his speech was not protected by the First Amendment, and in holding that there was probable cause for his arrest--the existence of which would have defeated his claims of false arrest, malicious prosecution, and First Amendment retaliation. Rupp also contends that he was entitled to summary judgment in his favor. For the reasons that follow, we conclude that neither side was entitled to summary judgment.

A. *Summary Judgment Principles*

Principles governing consideration of motions for summary judgment-- and appellate review of the grant of such motions--are well established.

> A motion for summary judgment may properly be granted- -and the grant of summary judgment may properly be affirmed-- only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56[(a)]).

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("*Kaytor*"). "The function of the district court in considering the motion for summary judgment is *not to resolve*

*disputed questions of fact but only to determine whether*, as to any material issue, a genuine factual dispute exists." *Id*. (emphasis added).

In considering whether such a fact issue exists, the court is not to make credibility determinations or weigh the evidence. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (reviewing denial of defense motion for judgment as a matter of law following a jury verdict for plaintiff, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("*Liberty Lobby*")). The standard applicable to motions for judgment as a matter of law under Fed. R. Civ. P. 50 also applies to pretrial motions for summary judgment. *See Reeves*, 530 U.S. at 150; *Liberty Lobby*, 477 U.S. at 250-51. Further, in reviewing motions for such relief,

> *the district court may not properly consider the record in piecemeal fashion* . . . ; rather, it must "review all of the evidence in the record" . . . . And in reviewing all of the evidence to determine whether judgment as a matter of law is appropriate, "the court must *draw all reasonable inferences in favor of the nonmoving party*," . . . even though contrary inferences might reasonably be drawn . . . .

*Kaytor*, 609 F.3d at 545 (quoting *Reeves*, 530 U.S. at 150 (other internal quotation marks omitted) (first emphasis ours; second emphasis in *Kaytor*)). Summary judgment is

- 22 -

appropriate when "there can be but one reasonable conclusion as to the verdict." *Liberty Lobby*, 477 U.S. at 250.

B. *First Amendment Protection*

"The First Amendment guarantees all persons freedom to express their views. The scope of permitted expression is broad; insults that contain neither threats of coercion that intimidate nor fighting words that create the possibility of imminent violence, *see Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942), must be tolerated." *X-Men Security, Inc. v. Pataki*, 196 F.3d 56, 68-69 (2d Cir. 1999) (internal quotation marks omitted). The First Amendment "generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). This appeal primarily concerns the first element of a First Amendment retaliation claim--specifically whether Rupp's speech was protected by the First Amendment.

"[S]peech on matters of public concern is at the heart of First Amendment protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59 (1985) (plurality opinion) (internal quotation marks omitted). Whether speech "addresses a matter of public concern" is to "be determined by the content, form, and context of [the relevant] statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *see id*. at 140 (discussing First Amendment protection for government employees--who "do[] not," by accepting government employment, "relinquish First Amendment rights" "as a citizen[]" to "comment[] upon matters of public concern" (internal quotation marks omitted); *Dun & Bradstreet*, 472 U.S. at 761-62 (plurality opinion) (discussing First Amendment protection for credit reports sold through subscriptions). Speech that relates to "'any matter of political, social, or other concern to the community,'" *Jackler*, 658 F.3d at 236 (quoting *Connick*, 461 U.S. at 146), which may include conduct "implicat[ing] '*public safety and welfare*,'" *Gorman v. Rensselaer County*, 910 F.3d 40, 46 (2d Cir. 2018) (quoting *Jackler*, 658 F.3d at 236) (emphasis ours), for example, generally falls within the heart of the First Amendment's protection. While it may be a crime to "*falsely* shout[] fire in a theatre," *Schenck v. United States*, 249 U.S. 47, 52 (1919) (emphasis added), it is a public service to shout "fire" when such a fire exists.

For these reasons, "[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers," *City of Houston, Texas v. Hill*, 482 U.S. 451, 461 (1987)--including speech that, had it been between civilians might, especially in bygone eras of greater civility, have been viewed as "fighting words," *see, e.g., Greene v. Barber*, 310 F.3d 889, 896 (6th Cir. 2002) (to call a police officer "an 'asshole' [i]s not egregious enough to trigger application of the 'fighting words' doctrine").

In the present case, the district court ruled that Rupp's shout at McAlister was not entitled to First Amendment protection primarily because Rupp, at the time of his shout, "did not know that he was yelling at a police officer," D.Ct.Op., 2021 WL 1169182, at *8. But not knowing that the vehicle's driver was a police officer had no bearing on whether Rupp's shout was speech on a matter of public concern. Rupp did not need to know who was driving in the dark without headlights in order to understand that such conduct was dangerous. And he had not shouted at the driver until he saw the vehicle nearly hit the two pedestrians.

The district court rejected Rupp's contention that he was not required to "know that the driver was a police officer [in order] for his speech to be protected" by the First Amendment, because he was "warning" of the "dangerous" fact that the

- 25 -

vehicle was being driven "at night without headlights illuminated." *Id*. at *8. The court characterized Rupp's argument as "artful[]," quoting Rupp as having "admit[ted] that he yelled out because he was '[u]pset with the driver's reaction and provoked by the fear [the driver] had induced in [Rupp and his] wife,'" and ruling that "the undisputed record demonstrates that Rupp simply yelled at a passing car, after dark, which yell contained an expletive." *Id*. (quoting Rupp Aff. ¶ 7 (emphasis ours)).

We have many difficulties with this rationale, including the court's interpretation of the record, its assessments of the evidence, and its acceptance of defendants' assertion that there was in fact no danger.

First, the district court's characterizing Rupp's contention that he was warning of danger as "artful[]"--and so characterizing it because Rupp had stated in his affidavit that he was "[u]pset"--indicate that the court (a) made a negative assessment of Rupp's credibility, and (b) made that assessment by weighing Rupp's warning-of-danger explanation against another fragment of evidence. But credibility assessments and the weighing of evidence are the province of the factfinder. When the issue is whether a party is entitled to summary judgment, determinations of

credibility, choices between permissible inferences, and the weighing of the evidence are beyond the authority of the court.

Second, while the court found that Rupp's shout simply complained about his own personal situation, suggesting that it did not implicate a matter of public concern, the record plainly does not require that inference. While Rupp doubtless had been frightened when he noticed the approach of the lightless vehicle while he was crossing the street, he and his wife had already safely reached the other side before he made any shout. And there is nothing in the record to suggest that the driver of the vehicle reacted in any way to the street-crossing by the Rupps. Thus, whatever Rupp yelled could not have been in response to a "driver's reaction" to Rupp's own experience.

Third, relying solely on the first sentence of paragraph 7 of Rupp's affidavit, the court did not view the record in the light most favorable to Rupp, or in light of the record as a whole--or even in light of that section of the affidavit as a whole. In paragraph 6, Rupp described seeing the two pedestrians "step[] directly into the path" of the oncoming vehicle, seeing the vehicle "stop approximately two feet from the pedestrians," and seeing the driver "flash[] either his headlights or high-

beams at the pedestrians." (Rupp Aff. ¶ 6.) The next three sentences in the affidavit, including the middle sentence on which the district court solely focused, were:

> *The operator then turned the car lights back off.* [] Upset with the driver's reaction and provoked by the fear he had induced in my wife and me, I called out to the driver "turn your lights on, asshole." My words were a warning to the officer that *his headlights were still not on*.

(Rupp Aff. ¶¶ 6-7 (emphases added).) With the evidence provided in paragraphs 6 and 7, a jury could well disagree with the court's conclusion that "Rupp simply yelled at a passing car," D.Ct.Op., 2021 WL 1169182, at *8.

Fourth, as to the substance of Rupp's five-word shout, the court focused on the fact that it "contained an expletive," *id.* As discussed in Part II.C.1. below, a jury would be entitled to view a shout as unreasonable noise if all five words were "asshole" or other expletives; but in fact Rupp shouted "turn your lights on, asshole." We have no doubt that he was upset; but his shout was an exhortation that was forward-looking in the interest of public safety. A rational juror could easily view the shout *as* an attempt to avert a possible accident by (a) a vehicle without lights, (b) whose driver appeared not to know he was driving without lights, (c) who had just had to stop for two pedestrians in his path attempting to cross the street, and (d) who

even after that abrupt stop, resumed driving without headlights--and thus could easily view the shout as eminently reasonable.

We also note our puzzlement at the court's reliance on the fact that "McAlister" himself did "*no[t] . . . view the situation* with the two pedestrians *as dangerous*," D.Ct.Op., 2021 WL 1169182, at \*10 (emphases added), especially since the court also noted that there was "no evidence that McAlister knew *while he was driving* that his headlights were off," *id*. (emphasis in original). One of the main purposes of headlights is to permit the driver to see at a distance what is in his path. As an objective matter, it is difficult to credit a safety assessment by an officer who was bereft of the benefit of headlights; it is all the more difficult to accept his "view" or assessment if in fact he did not know he was driving without headlights. And whether McAlister was negligently or deliberately driving without his headlights on, it must surely have been dangerous for the two pedestrians; they unknowingly stepped into the path of a hard-to-see vehicle, "caus[ing the driver] to *have to stop* to allow them to cross safely," *id*. (emphasis added). Yet the district court appears to have viewed McAlister's possible ignorance that he was driving without headlights as making it unreasonable for a concerned observer to yell at him to turn them on.

Finally, the district court was not entitled to adopt the defendants' view that the vehicle without its headlights on did not present a danger to, and was not involved in a near-accident with, the two pedestrians. We note that in response to Rupp's contention that there had been a "near-accident," defendants stated, in pertinent part, that they "do dispute that there was a *near*-accident *as Defendant McAlister was able to safely stop* the vehicle *without striking* the pedestrians." (Defendants' Local Rule 56(a) Response ¶ 8 (emphases added).) As an effort to deny that there had been a "near" accident, the explanation that there was no actual accident is simply a non sequitur. Yet the simple fact that an accident did not occur was the district court's rationale for concluding that there was no near-accident. *See* D.Ct.Op., 2021 WL 1169182, at *10 n.8 (rejecting the contention that McAlister had "nearly" hit the two pedestrians, because "it is undisputed that McAlister stopped his vehicle and that the pedestrians crossed safely").

In our view, the record would easily support a finding that there was a near-accident, and defendants adduced no evidence to show that there was not. In support of their non-sequitur denial of a near-accident, defendants submitted an affidavit from McAlister that is significant for both what it asserts and what it omits. McAlister states, *inter alia*, that in proceeding down Seneca Street he "observed two

female pedestrians *abruptly walk out into the street,*" that he stopped and flashed the lights to signal that it was safe for them to cross, and that after they had "safely crossed," he "began to drive away." (McAlister Aff. ¶¶ 4-5 (emphasis added).) He omits mention of the fact that when he saw the pedestrians he was driving without headlights or other illumination--conduct that defendants nonetheless admit (*see* Undisputed ¶ 4). Nor does he mention that when he began to drive away from that spot, he again was driving without lights, which defendants also acknowledge (*see* Defendants' brief on appeal at 2 ("After the women safely crossed, the vehicle's lights then went dark again as McAlister proceeded . . . .")). McAlister's affidavit also does not provide any estimate as to how near his vehicle was to the pedestrians when he stopped it, although his indication that the pedestrians appeared in the roadway suddenly ("abruptly") supports an inference--which a jury would be entitled to draw-- that the pedestrians were relatively close when he first saw them, and hence were close when he managed to stop the vehicle. As the district court stated, "[f]rom McAlister's perspective, [when] the pedestrians stepped in front of him," he "*ha[d] to stop* to allow them to cross safely." D.Ct.Op., 2021 WL 1169182, at *10 (emphasis added).

Nothing in McAlister's affidavit refutes the statements in the affidavits submitted by Rupp and his wife that McAlister stopped his vehicle "two feet" (Rupp Aff. ¶ 6) or "inches" (Linda Rupp Aff. ¶ 4) from the crossing pedestrians, and that there was in fact a near-accident. McAlister's perception that he "*ha[d] to stop*" in order for the pedestrians "to cross safely," D.Ct.Op., 2021 WL 1169182, at *10 (emphasis added), is more consistent with a near-accident than with defendants' conclusory denial.

In sum, on this record, the district court was required, for purposes of defendants' motion for summary judgment, to infer that there had been a near-accident, to accept that the driver had resumed driving with his headlights off after the near-accident, and to credit Rupp's assertion that he yelled for the driver to turn his lights on because of the near-accident and because the vehicle posed a danger to others if it continued without headlights. The record did not permit the court to rule that Rupp's shout did not concern a matter of public safety that was entitled to First Amendment protection.

A claim that an arrest was made in retaliation for the exercise of First Amendment rights--like a claim for false arrest or malicious prosecution--may be defeated by the existence of probable cause for the arrest. *See, e.g.*, *Nieves v. Bartlett*,

- 32 -

139 S. Ct. 1715 (2019). For the reasons discussed in Part II.C. below, we conclude that defendants were not entitled to summary judgment on issues related to probable cause.

C. *The Buffalo City Code and Probable Cause*

1. *The City Code*

Rupp was ticketed for violating the Buffalo noise ordinance, Buffalo City Code §§ 293-4 and 293-7. As the district court noted, the applicable part of § 293-4 provides that

> [t]he following acts and the causes thereof are declared to be in violation of this chapter and to constitute *unreasonable* noise:
>
> . . . .
>
> (G) Yelling, shouting or hooting at any time or place *so as to annoy or disturb the quiet, comfort and repose of a reasonable person of normal sensitivities*.

Buffalo City Code § 293-4(G) (emphases added). Section 293-7 is the penalty section, subjecting a violator to up to 15 days in jail or a fine of up to $1,500. The stated "intent" of the ordinance is

> to prohibit all *excessive and unreasonable* noise from all sources subject to its police power in order to preserve, protect and

- 33 -

promote health, *safety and welfare* and the peace, quiet, comfort and repose of persons within the City.

Buffalo City Code § 293-1 (emphases added).

2. *Probable Cause*

In general, probable cause to arrest exists when "the historical facts, viewed from the standpoint of an objectively reasonable police officer," *Ornelas v. United States*, 517 U.S. 690, 696 (1996), provide knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested, *see, e.g., Devenpeck v. Alford*, 543 U.S. 146, 152-53 (2004) ("the circumstances" must be "viewed objectively"); *Whren v. United States*, 517 U.S. 806, 813 (1996) (same).

As the district court noted, the existence of "'[p]robable cause for an arrest must be determined on the basis of the information reasonably available to the arresting officer *at the time of the arrest*,'" D.Ct.Op., 2021 WL 1169182, at *10 (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 570 (2d Cir. 1996) (emphasis ours)).

- 34 -

3. *The Record*

As described more fully in Part I.C. above, the district court "conclude[d] as a matter of law that McAlister had probable cause to detain and cite Rupp for violating the noise ordinance," summarizing that "it was approximately 8:30 p.m. and dark outside" at the time of Rupp's shout, and that

> Rupp yelled loudly at night in a public place--*loudly enough for McAlister to hear him in his running vehicle as he proceeded down the street*--in front of a restaurant and *at least three unknown individuals*, and his yell contained an expletive. *Given both the volume and nature of Rupp's yell in the presence of bystanders*, a reasonable person of normal sensitivities could be annoyed and have their quiet, comfort, and repose disturbed.

D.Ct.Op., 2021 WL 1169182, at *10 (emphases added). But the Buffalo noise ordinance prohibits noise that is "unreasonable," and a rational jury could well find, based on facts as shown in this record, that McAlister had no belief, and no basis for a reasonable belief, that Rupp's yelling at him to turn on his lights was either in substance or in volume unreasonable.

With the record viewed in the light most favorable to Rupp, and given the undisputed facts that McAlister's vehicle was moving in the dark with no headlights--both before and after a near-accident with the two pedestrians--a jury could well find that the "nature" of Rupp's yell, urging the driver to put on his lights,

was entirely appropriate. Further, given that the goal of the shout was to alert the driver to turn on his headlights, the yell obviously needed to be loud enough for the driver to hear it inside his running vehicle. The jury could easily conclude that the "volume" of the yell was not unreasonable.

The jury would also be entitled not to share the court's characterization of two of the "three unknown individuals" as mere "bystanders," *id*.; *see id*. at *11 ("two bystanders (the pedestrians)")--*i.e.*, as merely comfortable onlookers in repose who could have been disturbed by the shout--given that they in fact had just nearly been hit by McAlister's vehicle. Nor would the jury be required to accept the court's opinion that McAlister (apparently the third of the "three unknown individuals") was entitled to have his own "quiet, comfort, and repose"--and complacent negligence-- undisturbed.

Given that the intent of the Buffalo noise ordinance is in part to "promote health, safety and welfare" in the City, we see no valid basis for concluding that it was intended to criminalize a brief shout intended to urge a person driving in the dark without headlights--especially when his vehicle has just nearly hit two pedestrians--to turn on his lights. Although the court acknowledged at the start of its decision that McAlister turned his lights back off after his encounter with the two pedestrians, *see*

D.Ct.Op., 2021 WL 1169182, at *2 ("[t]he vehicle's lights then went dark again as McAlister proceeded"), it never mentioned that fact in its discussion of the circumstances surrounding Rupp's shout. Instead, it mentioned at least three times that Rupp's shout contained an "expletive," *id*. at *8, *10, *11, despite the fact that the presence of an expletive did not eliminate or diminish the character of the shout as a warning.

Where the record reveals issues as to whether the circumstances indicated that shouting was or was not unreasonably noisy, those issues are for the jury. For example, the plaintiff in *Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir. 2001) ("*Provost*"), had attempted to communicate with a civilian police department employee at a police station through a "thick, bullet proof, glass partition" that made it difficult to be heard; Provost had "banged on the glass," and "hollered," and "yelled through the window." *Id*. at 158 (internal quotation marks omitted). He was eventually arrested for "disorderly conduct," which includes a variety of acts "inten[ded] to cause public . . . annoyance," N.Y. Penal L. § 240.20. Such acts include making "unreasonable noise," in violation of § 240.20(2), which was one of the two subdivisions of § 240.20 that were "arguably appl[icable] to []his case," *Provost*, 262 F.3d at 158-59. Provost was charged, under the other potentially applicable

subdivision, with "us[ing]" "in a public place . . . abusive or obscene language," N.Y. Penal L. § 240.20(3):

> [D]efendant did intentionally use abusive and obscene language in a public place--the police department lobby, saying to civilian police department employee Dave Fisher "I don't have time for your bullshit" and "I can't jerk around all day like you." Defendant did engage in this behavior in view of several civilian persons in the lobby.

*Provost*, 262 F.3d at 152 (quoting charging instrument).

After the charge was dismissed, Provost brought an action under § 1983 against arresting officer John Roper and others for false arrest. The jury awarded Provost nominal and punitive damages, and we affirmed that judgment against Roper. We noted, *inter alia*, that

> [t]he jury could reasonably have concluded that Roper knew that Provost's "holler[ing]" and "yell[ing] through the window" was *for the legitimate purpose of getting the desk officer's attention*, not to cause "public inconvenience, annoyance or alarm."

*Provost*, 262 F.3d at 158 (quoting N.Y. Penal L. § 240.20 (emphasis added)). We concluded that,

> [v]iewing all this evidence in the light most favorable to Provost, . . . a jury could reasonably find that Provost raised his voice and "banged on the glass" only *to the extent it was necessary to do so to be heard* and that the *noise* he made *was not*

*"unreasonable"* in the circumstances *and that Roper understood as much*.

*Provost*, 262 F.3d at 159 (emphases added).

Further, in *Provost*, the plaintiff was arrested not immediately after the banging and shouting described in the charge against him, but only after an additional face-to-face conversation with Roper in a hallway:

Roper testified . . . that he did not decide to arrest Provost until after Provost had gone into the back of the station. *The jury could rationally have found on that basis that Roper did not believe Provost made unreasonable noise when he banged on the glass and hollered through the slot in the window.* Instead, a reasonable jury could have found that Roper's testimony about Provost's noisiness was a pretext developed after the fact *and that Roper really arrested Provost in retaliation for the angry, insulting* attitude Provost exhibited after he had been summoned by Roper into the hallway. *The jury could have found, in other words, that Roper's decision to arrest Provost was an abuse of power and that Roper's claim that Provost made a public disturbance was a falsification.*

*Id*. at 159 (emphases added).

That sequence in *Provost* has some parallels to the sequence shown in the record here. Although McAlister, upon hearing Rupp's shout, turned into the parking lot to follow Rupp, he did not immediately issue Rupp a ticket or immediately tell Rupp he was being detained. Indeed, McAlister at first did not even bother to exit his vehicle. Rather, he "rolled down the front passenger window, leaned across the

console, and said 'You know, you can be arrested for that.'" (Rupp Aff. ¶ 11; *see also* Linda Rupp Aff. ¶ 8.) Rupp responded by stating that McAlister should not be driving on city streets after dark without headlights on and he "reminded . . . McAlister that [McAlister] had almost cause[d] a pedestrian accident." (Undisputed ¶ 12). Only then, after Rupp had begun to scold him for driving without headlights in violation of the traffic laws and for nearly hitting the pedestrians, did McAlister get out of his vehicle and tell Rupp that he was being detained. And only after about a quarter-hour more of discussion between Rupp and McAlister, or among Rupp and one or more of the three officers eventually present, with Rupp urging repeatedly that McAlister be cited for a VTL violation--or, finally, after discussion among McAlister, Parisi, and Giallella privately beyond earshot of the Rupps--was Rupp issued the noise-ordinance summons signed by McAlister.

Although the district court noted that the existence of probable cause for an arrest is to be determined on the basis of the information reasonably available to the arresting officer "at the time of the arrest," *see* D.Ct.Op., 2021 WL 1169182, at *10 (internal quotation marks omitted), the court made no mention of the facts that McAlister knew at the time he arrested Rupp; it instead stressed the lack of evidence as to the state of McAlister's knowledge earlier, stating that it was "no[t]" clear "that

- 40 -

McAlister knew *while he was driving* that his headlights were off," *id*. (emphasis in original). It is undisputed, however, that before signing the ticket given to Rupp, McAlister had admitted to driving without headlights. (*See* Undisputed ¶ 17 (Officer "Parisi . . . arrived at the scene and defendant McAlister admitted that he was driving the vehicle without headlights").) Thus, whatever the state of his knowledge while he was driving, McAlister indisputably knew that he had in fact been driving without headlights when he decided to arrest Rupp on the basis that the shout to turn his lights on--a shout that needed to be loud enough to get the attention of McAlister inside his vehicle--constituted noise that was unreasonable.

Here, as in *Provost*, a jury could reasonably "conclu[de] that [the arresting officer] did not have probable cause to believe that [the plaintiff's] behavior fit within" the noise prohibition, because the jury would be "entitled to conclude that [the arresting] officers were aware of [the plaintiff's] legitimate reason for shouting, but arrested [him] nonetheless." 262 F.3d at 158, 160 (internal quotation marks omitted).

4. *Arguable Probable Cause*

Defendants also argue, and the district court ruled, that if there was not probable cause for Rupp's arrest, the individual defendants were at least entitled to

summary judgment on the basis of qualified immunity on the ground that there was "arguable" probable cause. Again we disagree.

Qualified immunity shields officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). With respect to a claim of arrest without probable cause, the doctrine shields officers from suit for damages if "'a reasonable officer could have believed'" his action "'to be lawful, in light of clearly established law *and the information [he] possessed*.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (emphasis ours)).

In addition, qualified immunity is available where officers of reasonable competence could disagree on whether the probable cause test was met, *Malley v. Briggs*, 475 U.S. 335, 341 (1986), *i.e.*, where the existence of probable cause for an arrest was at least reasonable and arguable, *see, e.g.*, *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015), "even if mistaken," *Hunter*, 502 U.S. at 229. But while a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, that doctrine does not shield performance that either (a) was in violation of clearly

established law, or (b) was plainly incompetent. *See, e.g., id*. at 228 (the test is "whether the agents acted reasonably under settled law in the circumstances"); *id*. at 229 ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting '*all but the plainly incompetent* or those who knowingly violate the law.'" (quoting *Malley*, 475 U.S. at 343, 341 (emphasis ours))).

Here, the record indicates that McAlister had been instructed to retrieve a lieutenant's car from one police site and deliver it to another. *See* D.Ct.Op., 2021 WL 1169182, at *2 n.3. We cannot agree that a person of reasonable caution would drive on city streets in the dark without headlights either intentionally or negligently. Nor can we agree that, as a matter of law, a reasonable officer (unless on an official mission of stealth) driving on a city street in the dark without headlights could have any objectively reasonable belief--or even an arguably reasonable belief--that a shout to him to "turn your lights on, asshole" constituted an unreasonable infringement on his own comfort and repose, or the doubtless-dissipated comfort of the pedestrians he had just managed to brake in order to avoid hitting, or the comfort and repose of anyone else who could have been (but in this case was not shown to be) in the vicinity, so as to constitute a violation of the Buffalo ordinance prohibiting noise that was unreasonable. Plainly McAlister was annoyed; but we cannot agree that, as a

matter of law, any reasonable person of normal sensitivities would be annoyed or disturbed by a brief shout that could save lives endangered by a person who was driving without headlights, and who had nearly hit pedestrians without perceiving any danger.

D. *Other Issues*

For the reasons stated above, we vacate the dismissals of Rupp's claims for false arrest, malicious prosecution, and First Amendment retaliation, *i.e.*, Claims 1, 2, 4, and 5, *see* Part I.B. above. We also reinstate his claims for failure to intervene or for respondeat superior (Claims 7 and 11), which were dismissed by the district court because it had dismissed the predicate claims, which we are reinstating.

We affirm the dismissal of Rupp's claim that his First Amendment rights were violated by the noise ordinance "as-applied" to him. The record contains no evidence of any immediate or interim curtailment of Rupp's speech rights; and after a full hearing, Rupp was found not guilty of violating the noise ordinance. Thus, the ordinance was not actually applied to him. His claims of false arrest, malicious prosecution, and First Amendment retaliation are being reinstated.

We decline Rupp's request for entry of summary judgment in his favor. In reviewing the district court's grant of summary judgment against Rupp, we were required to draw all reasonable inferences or make all credibility determinations in his favor. A jury at trial of course is under no such obligation. And in considering Rupp's motion for summary judgment in his favor, we are required to draw all such inferences and make such credibility determinations against him. As indicated above, there are questions for the jury as to the dangerousness of the circumstances Rupp observed--for example, whether and to what extent McAlister came close to hitting the pedestrians.

CONCLUSION

We have considered all of defendants' contentions in support of summary judgment in their favor and have found them to be without merit. The judgment is affirmed to the extent that it dismissed Rupp's Claim 9; it is vacated to the extent that it dismissed Rupp's Claims 1, 2, 4, 5, 7, and 11, and the matter is remanded for trial of those claims.

Costs to plaintiff.